1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name  Ramirez          Martin              A
           (Last)            (First)          (Initial)

3    Prisoner Number __D-66383_____

4    Institutional Address _P.O. Box 689/FW-138-U_____

5    Correctional Training Facility, Soledad, CA.93960-0689

6    ══════════════════════════════════════════════════════
                    UNITED STATES DISTRICT COURT
7                   NORTHERN DISTRICT OF CALIFORNIA

8    Martin A. Ramirez                    )
     (Enter the full name of plaintiff in this action.)  )    08              2159
9                                         )
                    vs.                   )    Case No. _____
10                                        )    (To be provided by the clerk of court)
     Ben Curry et. al.,                   )
11   _____  )    PETITION FOR A WRIT
                                          )    OF HABEAS CORPUS
12   _____  )
                                          )
13   _____  )
                                          )    E-filing
14   (Enter the full name of respondent(s) or jailor in this action)  )
                                          )
15   ══════════════════════════════════════════════════════

16                    Read Comments Carefully Before Filling In          (PR)

17   When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>Los Angeles County</u>    <u>Superior Court</u>

Court                        Location

    (b)   Case number, if known <u>A035761</u>

    (c)   Date and terms of sentence <u>August 28,1987</u>

    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>X</u>    No _____

           Where?

           Name of Institution: <u>Correctional Training Facility</u>

           Address: <u>P.O. Box 689/ FW-138-U /Soledad,CA.93960</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>Second degree murder / Penal Code 187</u>

3. Did you have any of the following?

    Arraignment:                             Yes __x__   No _____

    Preliminary Hearing:                 Yes __x__   No _____

    Motion to Suppress:                 Yes _____   No __x__

4. How did you plead?

    Guilty _____    Not Guilty __x__    Nolo Contendere _____

    Any other plea (specify) ____no_____

5. If you went to trial, what kind of trial did you have?

    Jury __x__    Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?              Yes __x__   No _____

7. Did you have an attorney at the following proceedings:

    (a)   Arraignment                Yes __x__   No _____

    (b)   Preliminary hearing       Yes __x__   No _____

    (c)   Time of plea                Yes __x__   No _____

    (d)   Trial                        Yes __x__   No _____

    (e)   Sentencing                 Yes __x__   No _____

    (f)   Appeal                     Yes __x__   No _____

    (g)   Other post-conviction proceeding   Yes _____   No __x__

8. Did you appeal your conviction?        Yes __x__   No _____

    (a)   If you did, to what court(s) did you appeal?

          Court of Appeal             Yes __x__   No _____

          Year: _1987_      Result: judgment affirmed_____

          Supreme Court of California    Yes _____   No __x__

          Year: _____    Result: _____

          Any other court            Yes _____   No _____

          Year: _____    Result: _____

    (b)   If you appealed, were the grounds the same as those that you are raising in this

1        petition?                     Yes _____     No_X_____

2      (c)   Was there an opinion?         Yes _____     No_X_____

3      (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                         Yes _____     No_X_____

5          If you did, give the name of the court and the result:

6

7          _____

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?        Yes _____     No_X_____

10         [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16    (a)   If you sought relief in any proceeding other than an appeal, answer the following

17         questions for each proceeding. Attach extra paper if you need more space.

18        I.   Name of Court: _____

19           Type of Proceeding: _____

20           Grounds raised (Be brief but specific):

21              a._____

22              b._____

23              c._____

24              d._____

25           Result: _____ Date of Result:_____

26       II.  Name of Court: _____

27           Type of Proceeding: _____

28           Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

III.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No__x__

Name and location of court: _____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One:_____ SEE ATTACHED PETITION _____

6  _____

7      Supporting Facts:_____ SEE ATTACHED PETITION _____

8  _____

9  _____

10  _____

11      Claim Two:_____ SEE ATTACHED PETITION _____

12  _____

13      Supporting Facts:_____ SEE ATTACHED PETITION _____

14  _____

15  _____

16  _____

17      Claim Three:_____ SEE ATTACHED PETITION _____

18  _____

19      Supporting Facts:_____ SEE ATTACHED PETITION _____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  SEE ATTACHED PETITION

5  _____

6  _____

7  Do you have an attorney for this petition?                Yes_X_     No____

8  If you do, give the name and address of your attorney:

9  _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___4 - 22 - 08___         _____

14             Date                Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS    - 7 -

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4

5  MARTIN A. RAMIREZ                    Case No. _____.

6      Petitioner

7  v.

8  BEN CURRY, Warden

9      Respondent
                                    /

10

11

12

13

14

15      PETITION FOR WRIT OF HABEAS CORPUS;

16      MEMORANDUM OF POINTS & AUTHORITIES

17

18

19

20

21

22                              Martin A. Ramirez D-66383
                                P.O. Box 689/FW-138-U
23                              CTF Central Facility
                                Soledad, CA.93960-0689
24
                                Petitioner In Pro Per
25

26

27

28

1

# TABLE OF CONTENTS

2

3    Petition For Writ Of Habeas Corpus                                          1

4    I. Procedural History; Administrative &
        Judicial Remedies                                                        2

5    The Petition is Timely                                                      2

6    Petitioner is in Custody                                                    2

7    Exhaustion of Administrative Remedies                                       2

8    Exhaustion of State Remedies                                                2

9    Jurisdiction and Venue                                                      2

10   II. Statement of Case.                                                      3

11   III. Parties                                                                3

12   IV.  Circumstances of The Offense                                           4

13   V.    The Board of Parole Hearings Record                                   4

14   VI.  Petitioner's Psychological Evaluation                                  5

15   VII. Petitioner's Prior Record                                              5

16   VIII. Prayer For Relief                                                     6

17   IX.  Memorandum of Points And Authorities                                   7

18        The Law on Parole                                                      7

19        1. The Decision is Not Supported by Any Relevant
              or Material Evidence                                              9
20

21        (a) The Commitment Offense Does Not Constitute
              "Some Evidence" For Denial of Parole in This
22            Case.                                        9,10,11,12,13

23        2. The Board's Boilerplate Reliance on Static
              History Factors Violates Fundmental Due
24            Process                              13,14,15,16,17,18,19,20

25   CONCLUSION                                                            20,21

26

27

28

i

1

### TABLE OF EXHIBITS

2

1.  Hearing Transcript - April 25, 2007

3

2.  Los Angeles Superior Court denying habeas corpus petition

4

3.  Court of Appeal Order denying habeas corpus petition

5

4.  California Supreme Court order denying petition for review

6

7

### TABLE OF AUTHORITIES

8

In re Barker (2007) 151 Cal. App. 4th 369 ..................... 18,19

9

Biggs v. Terhune 334 F.3d 910
10
(9th Cir. Cal. 2003)................................. 8,13,16,17,18,20

11
Board of Pardons v. Allen
(1987)482 U.S. 369,377-378....................................7,16,17

12
In re Caswell, \92 Cal. App. 4th 1017,1030 ..................... 8,15

13
Cato v. Rushen 824 F.2d 703
14
(9th Cir. Cal. 1987) ............................................. 8

15
In re Dannenberg (2005) 34 Cal. 4th 1061, 1095 ............. 11,12,19

16
In re Deluna (2005) 126 Cal. App. 4th 585 ...................... 12

17
In re Elkins (2006) 144 Cal. App. 4th 480-481 ................ 10,13

18
Greenholtz v. Inmates of Nebraska Penal
(1979) 442 U.S. 1,12 ..................................... 7,16,17,19

19
Irons v. Carey, 479 F.3d 658,665
20
(9th Cir. 2007) ......................................... 16,17,20

21
Jancsek v. Oregon Board of Parole. 833 F.2d 1389,1390
(9th Cir. 1987) ................................................. 8,9

22
Joint Anti-Fascist Refugee Comm. v. McGrath
23
(1951) 341 U.S. 123,163 ........................................ 14

24
Lankford v. Idaho (    ) 500 U.S. 110,121 ........................ 13

25
In re Lawrence (2007) 150 Cal. App. 4th 1534-1542 ...........17,18,20

26
In re Lee (2006) 143 Cal. App. 4th 1409 ............. 11,12,18,19,20

27
In re Lowe (2005) 130 Cal. App. 4th 1411-1412 .................10,12

28
Martin v. Marshall (2006) 431 F. Supp.2d 1038            13,20

**TABLE OF AUTHORITIES**

CONTINUED

In re McClendon (2003) 113 Cal. App. 4th 315 ..................... 12

McQuillion v. Duncan 306 F.3d 895,902
(9th Cir. 2002) .......................................... 8,15,17

Morrissey v. Brewer (1972) 408 U.S. 471,481 ...................... 9

O'Connor v. Donaldson (1975), 422 U.S. 563,575 .................. 20

In re Ramirez, 94 Cal. App. 4th 549,565 .......................... 7

In re Rosenkrantz (2002) 29 Cal. App. 4th 616,653········7,8,12,14,17

Sass v. Board of Prison Terms 461 F.3d 1123,1129
(9th Cir. 2006)                                              16,17

In re Scott (2004) 119 Cal. App. 4th 587......................... 11

In re Scott (2005) 133 Cal. App. 4th 573,595 .................. 12,20

In re Smith (2003) 109 Cal. App. 4th 489,504 .................... 11

In re Smith (2003) 114 Cal. App. 4th 366-367.................. 10,20

People v. Summers (1983) 147 Cal. App. 3d 180,184 ............... 11

Superintendent v. Hill (1985) 472 U.S. 445,456 .................. 9

In re Tripp (2007) 150 Cal. App. 4th 320 ........................ 18

In re Weider (2006) 145 Cal App. 4th 570 at 582-583.............. 19

Willis v. Kane __F.Supp. 2d__ (N.D. Cal. 2007)................... 20

Martin A. Ramirez D-66383
P.O. Box 689/FW-138-U
CTF Central Facility
Soledad, CA.93960-0689

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARTIN A. RAMIREZ | CASE NO. _____ |
| PETITIONER | PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF |
| ON HABEAS CORPUS _____/ | POINTS AND AUTHORITIES IN SUPPORT THEREOF. |

PETITION FOR WRIT OF HABEAS CORPUS

TO: THE HONORABLE UNITED STATES DISTRICT JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA.

    Based on facts, grounds, arguments, authorities and exhibits, herein petitioner, Martin A. Ramirez in propria persona respectfully seeks habeas corpus relief in an order

(a) Vacating Board of Parole Hearings action of April 25, 2007 that denied petitioner for the thrid time since becoming eligible for parole on December 27, 1996. The Board based its decision on the commitment offense and his institutional behavior consisting of four 128s and one 115 and no record of violence.

//

//

1.

1 (b) Petitioner, by way of this writ does not challenge his conditions
2 of confinement at the Correctional Training Facility, Soledad, Calif-
3 ornia. Rather, petitioner, by way of this writ does contest and cha-
4 llenge the violations of rules, regulations, California Penal Codes,
5 State and Federal case laws, and denial of protection of due process,
6 equal protection, and cruel and/or unusual punishment under both the
7 State and Federal Constitutions.

I.

## PROCEDURAL HISTORY;

## ADMINISTRATIVE & JUDICIAL REMEDIES

The Petition is Timely. The California Supreme Court denied a
petition for review of the instant claim on

AEDPA time constraints have been met.

Petitioner is in Custody. Petitioner is housed by the California
Department of Corrections & Rehabilitations at the Correctional Tr-
aining Facility (CTF), Soledad, California, Ben Curry, Warden.

Exhaustion of Administrative Remedies. California provides no ad-
ministrative remedy for action by the Board of Parole Hearings.
(See HT-8).

Exhaustion of State Court Remedies. The Los Angeles Superior Court
denied a habeas corpus petition (case no. BH004700) on December 3,
2007. The California Court of Appeal, Second Appellate District, de-
nied a petition raising the instant claims (case no. B204676) on
January 31, 2008). The California Supreme Court denied a petition
for review (case no.

Jurisdiction and Venue. This Court has Jurisdiction and is the pro-
per venue. 28 USC §2241 (d). Petitioner is confined at CTF, Soledad,
California.

2.

## II.

1          ### STATEMENT OF CASE

2          Preliminary formalities (HT 1). 1/ (Exhibit 1, hearing trans-
3     cript of parole hearinh conducted on April 25, 2007).

4          Martin A. Ramirez (hereafter petitioner) was received by the
5     California Department of Corrections & Rehabilitations on September
6     16, 1987, committed from Los Angeles County for the offense of second
7     degree murder in violation of Penal Code §187. He is indeterminately
8     sentenced to a term of 15 years to life without any additional en-
9     hancements. His case number is A035761. His minimum eligible parole
10    date is December 27, 1987.
                                       ### III.
11

12                                    ### PARTIES

13          Petitioner, Martin A. Ramirez CDC number #D-66383 is a prisoner
14    of the state of California.
15

16          Respondent, Ben Curry is the Warden of the Correctional Corr-
17    ectional Training Facility, Soledad, California and is the legal cu-
18    stodian of the petitioner.

19    //
20    //
21    //
22    //
23    //
24    //
25    //
26    //

27    _____
      References to the parole hearing transcript will be indicated by HT
28    followed by page number, i.e, (HT 0).

                                      3.

IV.

## CIRCUMSTANCES OF THE OFFENSE

The following statements are taken from petitioner's hearing tra-nscripts dated April 25, 2007. (HT 10-11). On Christmas Eve, 1986, the victim, Geraldo Jones, and others were at a Christmas Eve Party when someone asked Jones to give him a ride home. Someone else drove, and the group parked in front of the residence at 1325 East 50th Street, Long Beach. Geraldo Jones got out of the van apparently to look for a friend. A witness reported that there were four or five Mexican males standing in the driveway when Ramirez shot Jones several times in the abdomen. Jones fell to the ground. Ramirez then shot him two more times while he was on the ground. There were a total of four gunshot wounds to the abdomen causing Jones' death. A friend of the victim who came upon the scene and tried to administer first aid and told investigating detectives that about a month before the shooting there was an argument between Jones and Ramirez threating to kill Jones. Several days later, Ramirez went to Long Beach Police Department and told desk personel he had killed someone

V.

## THE BOARD OF PAROLE HEARINGS RECORD

On April 25, 2007, a panel of the Board of Parole Hearings consid-ered the matter of petitioner's parole suitability for the third time in 20-years of incarceration. In making its determination, the panel relied on Penal Code 3041 (a) & (b), and California Code of Regulations, Title 15, Division. 2, 2402 (Determination of Suitability).

In the matter of Martin A. Ramirez, CDC# D-66383, the panel has reviewed all of the information received from the public and relied on

4.

1  the following circumstances in concluding that the prisoner is not suit-
2  able for parole and would pose an unreasonable risk of danger to society,
3  or a threat to public safety if released from prison.
4  The panel finds the offense was carried out in an especially cruel and
5  callous/violent manner. [CCR 2402, c, 1].
6  The victim was abused during this offense. [CCR, 2402, c, C].
7  The offense was carried out in a dispassionate and calculated manner.
8  [CCR. 2402, c, B].
9  The offense was carried out in a manner which demonstrates an excepti-
10  onally callous disregard for human life. [CCR. 2402, c, D].(HT 45-46).

11
## VI.

12
### PETITIONER'S PSYCHOLOGICAL EVALUATION

13

14      The record shows petitioner has been cleared by the Board's own
15  clinicians. His last psychological report dated 3/18/05 and authored by
16  Jeff Howlin, Ed.D. was favorable. In this regard he said the following:
17  His violence potential within a controlled setting is estimated to be
18  well below the average compared to his level two inmate population. If
19  released to the community, his violence potential was estimated to be
20  no more than the average citizen in the community. His most recent, his
21  most significant risk factor would be a precursor to violence would be
22  a return to the abuse of alcohol or drugs. Should this man abuse subst-
23  ances again, his violence potential would be considered much higher
24  than that of the average citizen in the community. (HT 47-48).

25
## VII.

26
### PETITIONER'S PRIOR RECORD

27      According to the evidence before the Board, petitioner has no
28  prior record as a juvenile or an adult.

# VIII.

## PRAYER FOR RELIEF

Martin Ramirez states that he has no other plain or speedy remedy save Habeas Corpus: therefore, he prays this honorable court;

1. Issue an order to show cause;

2. appoint counsel to represent petitioner in any and all proceedings in this matter;

3. conduct an evidentiary hearing;

4. order respondents to provide petitioner with reasonable discovery;

5. declare the rights of the petitioner;

6. grant any other further relief the court deems proper and just.

Dated: 4-22-08

_____
Martin Ramirez

6.

IX.

## MEMORANDUM OF POINTS AND AUTHORITIES

## THE LAW ON PAROLE

Penal Code section 3041, subdivision (a) requires that at a suitability hearing the board "shall normally set a parole release date...Subdivision (b) provides that a release date "shall" be set "unless" the Board determins that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this individual...See, e.g, In re Rosenkrantz, 29 Cal.App. 4th 616, at 653, (2002), citing to In re Ramirez, 94 Cal. App. 4th 549, at 565. The parole board regulations make this criterion more specific. The panel can deny only if the prisoner would pose an unreasonable risk of danger to society if released from prison. (Cal. Code Regs., tit 15, 2402, subd (a). The regulations set forth specific criteria to determine whether under the standard a prisoner is suitable for parole.

Under the rule created by the United States Supreme court in Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1,12, and Board of Pardons v. Allen (1987) 482 U.S. 369, 377-378, a state's statutory parole scheme which used mandatory language "creates a presumption that parole will be granted" when or unless certain designated findings are made, and therefore gives rise to a constitutional liberty interest. The California parole scheme uses mandatory language which is parallel to the parole scheme found in Greenholtz and Allen

1 | to give rise to a protected liberty interest in parole. Accordingly,
2 | the California parole scheme gives rise to a cognizable liberty in-
3 | terest in release on parole. See also, McQuillion v. Duncan, 306 F.3d
4 | 895, 902 (9th Cir. Cal.2002); and Biggs v. Terhune, 334 F.3d 910
5 | (9th Cir. Cal. 2003), affirming these propositions in California's
6 | section 3041, penal code. Following on the heels of McQuillion, supra,
7 | the siminal case of In re Rosenkrantz held that the satutory parole
8 | scheme creats a liberty interest under California due process of law.
9 | Id., at 29 Cal. 4th at 668, fn.12. The court then applied the clearly
10 | established federal due process test to review a gubernatorial dec-
11 | ision to deny parole. It recognized that a gubernatorial decision is
12 | subject to judicial review to determine whether there is "some evid-
13 | ence" to support the decision. In this case, the decision by the Board
14 | to find petitioner unsuitable for parole is also subject to review to
15 | determine if there is some evidence to support the decision, the ev-
16 | idence must bear some indicis of reliability, Cato v, Rushen, 824 F.
17 | 2d 703, 705 (9th Cir. Cal. 1987); also, Jancsek v. Oregon Board of
18 | Parole. 833 F. 2d 1389, 1390. (9th Cir. 1987). The evidence must be
19 | relevant and material to the decision. (Cal. Code Regs., 15. 2000 (b)
20 | (50) Good Cause; (63) Material Evidence, (90) Relevant Evidence (Ibid.
21 | (50) Good Cause: A finding by the board based upon a preponderance of
22 | the evidence that there is a factual basis and good reason for the
23 | decision made. Evidence which tends to prove or disprove an issue or
24 | facts in dispute.In re Caswell, 92 Cal. App. 4th 1017, 1030;McQuillion
25 | supra, 306F.3d at 906,910.

26
27
28

    A.   THE DECISION TO FIND PETITIONER UNSUITABLE FOR
         PAROLE IS AN ABUSE OF DISCRETION AND VIOLATES DUE
         PROCESS; PETITIONER MUST BE GRANTED A PAROLE DATE.

## 1. THE DECISION IS NOT SUPPORTED BY ANY RELEVANT OR MATERIAL EVIDENCE.

Proceeding under the presumption that the evidence must be relevant and material, there was no relevant or material evidence to base denial of parole to petitioner. Under federal due process analysis, after finding a liberty interest, it must be determined what process is due. Morrissey v. Brewer (1972) 408 U.S. 471, 481. In this context, the United States Supreme Court has held that there must be "some evidence" Superintendent v. Hill (1985) 472 U.S. 445, 456, where it states that "the fundamental fairness guaranteed by the due process clause does not require courts to set aside decisions of prison administrators that have some basic fact."

Additionally, the evidence underlying the Board's decision must have some indicia of reliability. Jancsek, supra 833 F. 2d at 1390. In this case, petitioner contends that the Board of Parole Hearings erroneously concluded there is some evidence to justify the finding that he is unsuitable for parole.

## (a). THE COMMITMENT OFFENSE DOES NOT CONSTITUTE "SOME EVIDENCE" FOR DENIAL OF PAROLE IN THIS CASE.

In finding petitioner unsuitable for parole the panel stated that the commitment offense was carried out in an especially cruel and callous/violent manner. Additionally, the victim was abused during this offense; the offense was carried out in a dispassionate and calculated manner. Moreover, the offense was carried out in a manner which demonstrates exceptionally callous disregard for human life. Such a finding is contrary to the facts of the case, where the record indicates that the petitioner would pose a violence potential well below average as

1  compared to level two inmate population. If released to the community,
2  his violence potential was estimated to be no more than the average cit-
3  izen in the community. (HT 47-48). It could be argued that any and all
4  murders are carried out in a manner that demonstrates an exceptionally
5  cruel and callous disregard for human life. And in fact is what second
6  degree murder is. But used as a regulation for unsuitability would have
7  to denote something grater than an ordinary or typical killing. Nonethe-
8  less, as the psychological evaluation report clearly demonstrates, pet-
9  itioner has made substantial and significant progress in growth and his
10 maturation during his 20 years of incarceration. Despite this offense,
11 he was sentenced to a parolable sentence. Certainly, his case falls wi-
12 thin the meaning expressed in Ramirez, supra, that any murder is parol-
13 able under the statute. Yet, the panel made no effort to distinguish his
14 offense as containing circumstances which are beyond the minimum nece-
15 ssary to sustain a conviction for the crime of second degree murder.

16     It could be argued that all murders are carried out in an espec-
17 ially cruel and violent manner, without regard to human suffering. (In
18 re Ernest Smith 114 Cal. App. 4th 366-367; (In re Lowe 130 Cal. App. 4th
19 1411-1412); In re Elkins 144 Cal. App. 4th 480-481). Second degree mur-
20 der requires express or implied malice--i.e, the perpetrator must kill
21 another person with the specific intent to do so; or he or she must ca-
22 use another persons death by intentionally performing an act, knowing
23 it is dangerous to life with conscious disregard for life. (§§ 187-189;
24 see CALJIC No. 8.11). For this reason, it can reasonably be said that
25 all second degree murders by definition involve some callousness--i.e,
26 lack of emotion or sympathy, emotional insensitivity, indifference to
27 the feelings and suffering of others. (See Webster's Third New Interna-
28 tional Dict. (3d ed. 1993) p. 319, col.1.) As noted, however, parole is

10.

1 │ the rule, rather than the expection, and a conviction for second degree
2 │ murder does not automatically render one unsuitable. Was the crime cal-
3 │ lous? Yes. However, are the facts of the crime some evidence that the
4 │ petitioner acted with exceptionally callous disregard for the victim in
5 │ this case more so than any second degree murder. Do the facts distingu-
6 │ ish this crime from other second degree murders as exceptionally callous,
7 │ the answer is no. (Cf. In re Smith (2003) 109 Cal. App. 4th 489, 504,
8 │ 506 [134 Cal. Rptr. 2d 781].

9 │     In denying parole for the third time in 20 years, the board finds
10 │ that the victim in this case was abused during this offense but failes
11 │ to demonstrate how how or when the victim was abused and yet the Board
12 │ finds this factor is evidence that the petitioner is a current threat
13 │ to public safety 20 years after the crime was committed.(HT 45).

14 │     To support a finding that the offense was committed in an especi-
15 │ ally cruel, callous & violent manner, there must be some evidence that
16 │ the violence and viciousness of the inmate's crime is grater than that
17 │ which is "minimally necessary to convict [the defendant] of the offense
18 │ for which he is confined." (§ 2402, subd. (c) (1); In re Dannenberg
19 │ (2005) 34 Cal. 4th 1061, 1095.)

20 │     Malice itself involves an element of viciousness--an extreme in-
21 │ difference to the value of human life. (People v. Summers (1983) 147
22 │ Cal. App. 3d 180, 184.) As has been previously noted, [A]ll second de-
23 │ gree murders by definition involve some callousness--i.e, lack of emot-
24 │ ion or sympathy, emotional insensitivity, indifference to the feelings
25 │ and suffering of others. (Scott I, supra, 119 Cal. App. 4th at p. 587.)
26 │ Thus, "the inquiry is whether among murders the one committed by the
27 │ petitioner was particularly heinous, atrocious or cruel." (In re Lee,
28 │ supra, 143 Cal. App. 4th at p. 1409). As one court recently stated:

11.

1   "The test is not whether some evidence supports the reasons the Board
2   cites for denying parole, but whether some evidence indicates a parolee's
3   release unreasonably endangers public safety". (In re Lee (2006 143 C.A.
4   4th 1400, 49 C. Rptr. 3d 931, 936 (emp. in original). In re Scott (2005)
5   133 Cal. App. 4th 573, 595 [34 Cal. Rptr. 3d 905] ["The commitment off-
6   ense can negate suitability [for parole] only if circumstances of the
7   crime ... rationally indicate that the offender will present an unreas-
8   onable public safety risk if released from prison "]; but see In re
9   Lowe (2005) 130 Cal. App. 4th 1405 [31 Cal. Rptr. 3d 1] [suggested some
10  evidence applies to the factors, not dangerousness]. Some evidence of
11  the existence of a particular factor does not necessarily equate to
12  some evidence the parolee's release unreasonably endangers public safety.

13      Comparing petitioner to defendants for whom the board or Governor
14  properly denied parole because the defendants crimes were atrocious is
15  illuminating.

16  --In Rosenkrantz, the defendant "brutally murdered his victim after a
    full week of careful preparation, rehearsal and execution". The defen-
17  dant killed his victim by firing "10 shots at close range from an ass-
    ault weapon and [firing] at least three or four shots into the victim's
18  head as he lay on the pavement". (Rosenkrantz, supra, 29 Cal. 4th at p.
    678).

19  --In re Dannenberg, supra, 34 Cal. 4th at p. 1095, the defendant "rea-
20  cted with extreme and sustained violence, "striking" multiple blows to
    his wife's head with a pipe wrench. "While she was helpless from her
21  injuries, he delivered the coup de grace by placing her head "into a
    bathtub full of water, ... or at least left it there without assisting
22  her until she was dead." (Ibid.)

23  --In re McClendon (2003) 113 Cal. App. 4th 315 [6 Cal. Rptr. 3d 278],
    the defendant planned a "calculated attack" in the middle of the night"
24  against his estranged wife. He arrived at her home wearing rubber glo-
    ves and carrying a handgun and wrench, which he used to attack his wife
25  and another victim. (Id. at pp. 321-322.)

26  --In re Deluna (2005) 126 Cal. App. 4th 585[24 Cal. Rptr. 3d 643], the
    defendant fought with the victim outside of a bar, retrieved a rifile,
27  shot the victim in the mouth and then "deliberate[ly] stalked the def-
    enseless victim" through the parking lot, firing at him until he died.
28  (Id. at p. 1414.)

1  --In re Elkins, (2006) 144 Cal. App. 4th 475, the defendant robbed a
   friend who was sleeping who owed money for drugs, a 19-year-old addict
2  who on probation for another offense struck the victim with a baseball
   bat then pummeld him to death with that bat, drove the body into the
   wilderness and dumped it down a remote embankment, stole more of the
3  victim's belongings from a storage locker, and fled the state. (Id.p.480)

4  --In martin v. Marshall (2006) 431 F. Supp. 2d 1038, the defendant, a
   drug user shot his drug dealer whom he owed money, and two other innoc-
5  ent restaurant patrons, killing both the dealer and one of the patrons.
   (Id. at p. 1040).

6
7       All of the above murders involved at least as "shockingly vicious

8  use of leathality" and "exceptionally callous disregard for human suff-

9  ering" as did petitioner's murder of his victim. Several resulted in the

10 killing or wounding of multiple victims. Several had economic as opposed

11 to emotional motives, and several prisoners were involved in other cri-

12 minal activities at the time of the offense. Yet state appellate courts

13 or federal courts found these earlier commitment offenses failed to pro-

14 vide "some evidence" of the perpetrator's present dangerousness if rel-

15 eased to the outside world. Additionally, two recent cases approved by

16 the California Supreme Court, In re Elkins, 144 Cal. App. 4th 475; In

17 re Lee, 143 Cal. App. 4th 1400, concluded that offense circumstances

18 more than 20-years old are not "reliable predictors and do not provide

19 "some evidence" for making an "unreasonable risk" finding.

20      2.   THE BOARD'S BOILERPLATE RELIANCE ON STATIC HISTORY
            FACTORS VIOLATES FUNDAMENTAL DUE PROCESS.

21
22      The Ninth Circuit has expressed concern about the use of the

23 commitment offense to repeatedly deny parole. As the circuit in Biggs

24 v. Terhune (9th Cir. 2003) 334 F 3d 910, 916, recently acknowledge: Due

25 Process is not a mechanical instrument. It is a process. It is a deli-

26 cate process of adjustment inescapably involving the exercise of judg-

27 ment by those whom the constitution has entrusted with the unfolding of

28 the process. "Lankford v. Idaho 500 U.S. 110, 121 (1991) (quoting

13.

1  Joint Anti-Fascist Refugee Comm. v.McGrath,341 U.S. 123, 163 (1951)
2  (Frankfuter, J., Concurring). A continued reliance in the future on an
3  unchanging factor, the circumstances of the crime... runs contrary to
4  the rehabilitative goals espoused by the prison system and could re-
5  sult in a due process violation. See also, In re Rosenkrantz, supra,
6  29 Cal. 4th at 689 (Moreno, J., concurring). (Emphasis added).Biggs
7  was denied at his first initial parole hearing. The Circuit allowed
8  that the commitment offense could be used at that initial hearing as
9  a legitimate cause for denial of parole, but questioned whether it
10  could be used as a factor to continue denying parole at subsequent
11  hearings. At first blush, the use of the offense in the petitioner's
12  case at his initial hearing might have been upheld as "some evidence".
13  but the hearing challenged here is his (3rd) subsequent hearing. The
14  Biggs court gave clear indication that had it been Biggs subsequent
15  hearing, the court may have found against the Board on using the off-
16  ense to again base parole denial on.

17     When considering the offense as circumstances for unsuitability
18  the Board must be and should be mindful that the circumstances of the
19  offense are static and unchangeable. The most important aspect of this
20  case is the dynamic changes that years of imprisonment and exposuer to
21  positive, behavioral programs has made in this petitioner. The record
22  shows that he has achieved the objective of corrections, i.e., to co-
23  rrect behavior, and the record shows official and professional recog-
24  nition that he does not pose an unreasonable risk to public safety if
25  paroled. Thus, since there is no evidence whatsoever of unreasonable
26  risk, which is the standard by which the Board's decision legally hi-
27  nges, the Board's decision denying petitioner parole must be reversed.
28  The statutory default must be enforced in this case. Because the rele-

vant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that petitioner commited his offense in an especially cruel and callous was arbitrary and capricious. Examined in light of the record, the Board's explanation of why petitioner is not suitable for release from prison is revealed as no more than the mouthing of conclusionary words. And to say that the petitioner abused his victim during this offense has absolutely no support in the record. The reliable factual underpinning that is constitutionally required cannot be shown (See McQuillion v. Duncan (9th Cir. 2002) 306 F. 3d 895, 902; (In re Caswell (2001) 92 Cal. App. 4th 1017, 1027), [112 Cal Rptr. 2d 462]. even under the exceptional deferential standard of review.(HT 45-50).

The "some evidence" used to support a parole decision must be based on relevant, reliable evidence, drawn from specified factors, serving to establish whether the inmate would pose a current threat to public safety.

The "some evidence" standard of review is laid out succinctly by Rosenkrantz: [w]e conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation.

Starting in 2002, when the Ninth Circuit once-and-for-all held that indeterminately sentenced prisoners in California have a protected liberty interest in parole "that is protected by the procedural safegaurds of Due Process Clause" (McQuillion v. Duncan, 306 F. 895, 903

15.

1    (9th Cir. 2002), there was a paradigm shift in interpreting
2  California's parole statutes for those indeterminately sentenced pri-
3  soners.

4    In 2003, the Ninth Circuit held, argued as "dicta," based on
5  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (here-
6  after Greenholtz), 442 U.S. 1, (1979) and Board of Pardons v. Allen,
7  483 U.S. 369 (1987), opined: "The parole Board's decision is one of
8  'equity' and requires a carefule balancing and assessment of factors
9  considered" (Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003), con-
10  cluding: "A continued reliance in the future on an unchanging factor,
11  the circumstances of the offense and conduct prior to imprisonment,
12  runs contrary to the rehabilitative goals espoused by the prison system
13  and could result in a due process violation" (Id., at 917).

14    In 2006, The Ninth Circuit, although affirming that Biggs repre-
15  sents the law of this circuit (Sass v. Board of Prison Terms,461 F.3d
16  1123, 1129 (9th Cir. 2006), appeared to back off from Biggs, leaving
17  some confusion among courts in this circuit. The law being a living or-
18  ganism, however, mutating as abuse by the Executive become obvious and
19  adjustments for those abuses become necessary, the Ninth Circuit has
20  not only reiterated its holding in Biggs (see Irons v. Carey, 479 F.3d
21  658, 665 (9th Cir. 2007) ["We hope that the Board will come to recognize
22  that in some cases, indefinite detention based solely on an inmate's
23  commitment offense, regardless of the extent of his rehabilitation,
24  will at some point violate due process, given the liberty interest that
25  flows from the relevant California statutes. Biggs, 334 F.3d at 917"]),
26  but the Irons Court noted: "We note that in all cases which we have
27  held that a parole board's decision to deem a prisoner unsuitable for
28  parole solely on the basis of his commitment offense comports with due

1  process, the decision was made before the inmate had served the minimum
2  number of years required by his sentence" (Id), as was the case in
3  Biggs and Sass, suggesting the due process violation is established
4  after the prisoner has served his or her minimum term.

5      Recently, in a detailed analysis of California and federal law,
6  the Second Appellate District recently held under both the California
7  and United States constitutions, life prisoners in California have a
8  "liberty interest" in parole and judicial review is the "some evidence"
9  standard (In re Lawrence, ___ Cal. App. 4th ___ (2007), 2007 WL 1475283,
10 *16-22 (filed 5/22/07), citing, inter alia, Greenholtz, 442 U.S. 1 sup
11 ra; Board of Pardon v. Allen, 482 U.S. 369, supra; Superintendent v.
12 Hill, 472 U.S. 445 (1985); McQuillion v. Duncan, 306 F.3d 895, supra;
13 Biggs v. Terhune, 334 F.3d 910, supra; Sass v. Board of Prison Terms,
14 461 F.3d 1123, supra; Irons v. Carey, 479 F.3d 658, supra; In re Rosen-
15 krantz, 29 Cal. 4th 616 (2002); In re Dannenberg, 34 Cal. 4th 1061
16 (2005)). The Lawrence court held, 2007 WL 1475283, at *22-23, supra):

17      "Combining the California and federal standard standards of
        review, as they have been articulated thus far by the Calif-
18      ornia Supreme Court and the Ninth Circuit, respectively, the
        commitment crime can lack the power to supply 'some evidence'
19      supporting a denial of parole because of the interplay betw-
        een two factors--the nature of that crime and the passage of
20      time since its commission. That is, the fact there is 'some
        evidence' the crime was commited and committed a certain way
21      at a certain time does not mean that crime necessarily repr-
        esents 'some evidence' the prisoner's release on parole will
22      pose an unreasonable risk of danger to the public safety at
        the present time. Whether it posesses the necessary predict-
23      ive value depends both on the nature of the crime and how long
        ago it happened."

24 Relative to "some evidence: "it is not just 'some evidence' to support
25 the Governor's findings, but 'some evidence' sufficient to satisfy the
26 statute's ultimate test is, 'some evidence' the release of Lawrence
27 would subject society to an 'unreasonable risk' of danger to public
28

17.

1   safety" (Id., at *26). "The test is not whether some evidence supports
2   the reasons the Governor cites for denying parole, but whether some
3   evidence indicates a parolee's release unreasonably endangers public
4   safety" (In re Lee, 143 Cal.App. 4th 1400, 1408 (2006), emphasis in
5   original, petition for review denied, depublication denied). In revi-
6   ewing a suitability determination, the Executive "must remain focused
7   not on the circumstances that may be aggravating in the abstract but,
8   rather, on facts indicating that release currently poses 'an unreason-
9   able risk of danger to society' (§ 2402, subd. (a); accord, pen code,
10  § 3041, subd. (b))" In re Elkins, 144 Cal. App. 4th 475, 499 (2006),
11  petition for review denied, depublication denied). In other words,
12  "whether the inmate will be able to live in society without committing
13  additional antisocial acts" (In re Lawrence, 2007 WL 1475283, *25,
14  supra).

15      Although the commitment offense can be initially used to deny
16  parole (Biggs v. Terhune, 334 F.3d, at 916, supra), as recently opined
17  In re Tripp, ___ Cal. App. 4th ___ (2007), DJDAR 5877, at 5881 c.2
18  [DJDAR 4/30/07]):

19      "the viciousness of the commitment offense must be balanced
        against the passage of time and any evidence of an inmate's
20      rehabilitation. Among the indicators of parole suitability
        are: '(7) Age. The prisoner's present age reduces the prob-
21      ability of recidivism. [¶] £8· Understanding and plans for
        the Future. The prisoner has made realistic plans for release
22      or has developed marketable skills that can be put to use
        upon release. [¶] (9).Institutional Behavior. Institutional
23      behavior indicates an enhanced ability to function within the
        law upon release.' (Reg., § 2402, subd. (d))."

24  Thus, weighing the commitment offense, against the passage of time,re-
25  habilitation, parole plans, and postconviction behavior, "[u]nless
26  there is an unreasonable risk the parole applicant will re-offend and
27  thus pose a risk to public safety she or he is to be released on par-
28  ole" (In re Lawrence, supra, at *24; See also In re Barker, ___ Cal.

18.

App. 4th ___ (2007), 2007 DJDAR 7548, 7556 c. 2 (DJDAR 5/29/07)
["'To deny parole, the reason must relate to a defendant's continued
risk to public safety"'] quoting In re Lee, 143 Cal. App. 4th, at 1414,
supra.

The offense and past history of substance abuse cannot be viewed
in a vacuum as though current, but is to be placed into perspective re-
lative to time, "entailing primarily what a man is and what he may be-
come rather than simply what he has done" (Greenholtz, supra, 442 U.S.,
at 10). As the Supreme Court opined in Greenholtz: "the purpose of par-
ole" is "the long-range objective of rehabilitation" (Id., at 13). In
considering parole, therefore, not only important is "the gravity of
the offense in a particular case[,]" but the "behavioral record of an
inmate during confinement is critical in the sense that it reflects the
degree to which the inmate is prepared to adjust to parole release"
(Id., at 15). Thus, a prisoner's "behavior in prison is often molded
by his hope and expectation of securing parole at the earliest time
permitted by law" (Id., at 20).

Another recent case relative to case at bench, in that petitioner
was convicted of second degree murder and sentenced to 15 years to
life, now having served a quarter century, 15 years past his minimum
eligible parole date and a decade past his minimum term in calendar
years, is the appellate court case of In re Weider, 145 Cal. App. 4th
570, at 582-583 (2006), in which the court noted:

> "[I]t should be self evident that after an inmate has served
> the equivalent of 25 years, whether his actions were more
> than minimally necessary for second degree conviction... is
> no longer the appropriate question. [The Board's] position,
> that inmates who were only convicted of second degree may
> forever be denied parole based on some modicum of evidence
> that their acts rose to the level of first, without acknow-
> ledging the fact that they have already served the time for
> a first, should be seen as so ridiculous that simply to
> state it is to refute it."

1    Petitioner, with postconviction custody credits, 4 years per
2    year for 80  months equals 26 and one half years, plus preconviction
3    credits (Willis v. Kane, ___ F. Supp. 2d___ (N.D. Cal. 2007), 2007 WL
4    1232060, *10), has exceeded even the maximum term of 33 years for first
5    degree murder, transmuting his sentence into life without the possibil-
6    ity of parole. Because we live in a society in which "[m]ere public in-
7    tolerance or animosity cannot constitutionally justify the deprivation
8    of a person's physical liberty" (O'Connor v. Donaldson, 422 U.S. 563,
9    575 (1975), we cannot let decisions based on political safety rather
10   than public safety stand.

11       Even if petitioner's term was to be fixed at the maximum for 2nd
12   degree murder, 21 years, having a three year parole, when excess cust-
13   ody credits are applied to parole, he is to be discharged (Martin v.
14   Marshall, 448 F. Supp. 2d 1143, 1145 (N.D. Cal. 2006).

15
16                            CONCLUSION

17       The question is, after the passage of time, is there any evidence
18   not that the offense was callous or cruel, but is petitioner a CURRENT
19   threat to public safety?  To determine that the commitment offense can-
20   not be viewed in a vacuum, but must be weighed against additional fa-
21   ctors. To deny parole, the reasons given, based on the evidence, must
22   be relevant to CURRENT threat to public safety (In re Lawrence, 2007
23   WL 1475283, *25, supra; In re Smith, 114 Cal. App. 4th 343, 371-372
24   (2003); In re Lee, 143 Cal. App. 4th at 1412, supra; In re Elkins, 144
25   Cal. App. 4th, at 496, 500-502, supra; In re Scott, 133 Cal. App. 4th,
26   573, 594-595 (2005); Biggs v. Terhune, 334 F.3d, 916-917, supra; Irons
27   v. Carry, 479 F.3d, at 665, supra.

28   WHEREFORE, in that petitioner has been imprisoned 11 years beyond his

1  minimum term, has an exemplary postconviction record, and the commitment

2  offense twenty years ago having no predictive value of current threat

3  to public safety, it is respectfully respectfully requested that the

4  writ be granted and the Board ordered to fix petitioner's term.

Dated:   4-22-08                    Respectfully submitted,


                                    Martin Ramirez

21.

1

2                      DECLARATION OF MARTIN A. RAMIREZ

3       I declare as follows:

4 I am the petitioner in this case. I am over the age of eighteen years.

5 I am a party to the attached action. I am a resident of the Correct-

6 ional Training Facility in Soledad, California. My address is P.O. Box

7 689/FW-138-U CTF Central Facility, Soledad, California.93960. I ser-

8 ved the attached document entitled "WRIT OF HABEAS CORPUS" on the

9 persons/parties specified below by placing a true copy of said document

10 into a sealed envelope with the appropriate postage affixed thereto

11 and surrendering said envelope to the following:

12

13 OFFICE OF THE ATTORNEY GENERAL

14 455 GOLDEN GATE AVENUE. SUITE 11000
   SAN FRANCISCO,CA.94102

15

16

17

18       I declare under penalty of purjury under the laws of the United

19 States that the foregoing is true and correct. Executed this 22

20 day of April , 2008 at the Correctional Training Facility in

21 Soledad, California

22

23

24

25

26                               Declarant

27

28

# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )          CDC Number D-66383
Hearing of:               )
                          )
MARTIN RAMIREZ            )
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 25, 2007

1:24 p.m.

PANEL PRESENT:

Philip S. Inglee, Presiding Commissioner
James Martin, Deputy Commissioner

OTHERS PRESENT:

Martin Ramirez, Inmate
David Ugalde, Interpreter
Patrick Sparks, Attorney for Inmate
Lawrence Morrison, Deputy District Attorney
James Evans, Observer, CPS Human Resource Services
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| No | See Review of Hearing |
| Yes | Transcript Memorandum |

**Joan Liban**
**Northern California Court Reporters**

ii

INDEX

Page

Proceedings ............................................... 1

Case Factors ............................................. 10

Pre-Commitment Factors ................................... 17

Post-Commitment Factors .................................. 28

Parole Plans ............................................. 21

Closing Statements ....................................... 40

Recess ................................................... 44

Decision ................................................. 45

Adjournment .............................................. 51

Transcriber Certification ................................ 52

--oOo--

1

**P R O C E E D I N G S**

1    **INMATE RAMIREZ:**  Good afternoon.

2    **DEPUTY COMMISSIONER MARTIN:** We're on tape.

3    **PRESIDING COMMISSIONER INGLEE:** Good afternoon,

4    Mr. Ramirez.

5    **INMATE RAMIREZ:** Good afternoon.

6    **PRESIDING COMMISSIONER INGLEE:** This is a

7    subsequent parole consideration hearing. This is for

8    Martin Ramirez, CDC number D-66383. Before we go any

9    further, I need to swear in our interpreter.  Please

10   raise your hand, sir. Do you solemnly swear that in

11   acting as an interpreter in this hearing, you will

12   accurately and correctly interpret the proceedings to

13   the best of your ability?

14   **INMATE RAMIREZ:** Yes.

15   **PRESIDING COMMISSIONER INGLEE:** Fine. Thank you.

16   Today's date is April the 25th 2007. The time is 1:24.

17   We are located at CTF, Soledad Prison. The Inmate was

18   received on 9/16/1987. He was committed from Los

19   Angeles County.  The life term began on 9/16/1987. The

20   Inmate's minimum eligible parole date is 12/27/1996.

21   The controlling offense for which the Inmate had been

22   committed is set forth in case number A035761, charging

23   in count one, violation of Penal Code Section 187, no

24   other counts or state accounts.  The Inmate received a

25   term of 15 years base term, no enhancements for 15

26   years to life.  We now have to identify ourselves for

2

1    the transcript. Starting with myself, we will give our

2    full names, spelling our last names. When it gets to

3    the prison, you'll do the same but you'll also give us

4    your CDC number. Starting with myself and going to my

5    left. My name is Philip Inglee. That's I-N-G-L-E-E. I'm

6    a Commissioner.

7         **DEPUTY COMMISSIONER MARTIN:** Good afternoon. I'm

8    James Martin, M-A-R-T-I-N. I am Deputy Commissioner.

9         **MR. EVANS:** My name is James Evans, E-V-A-N-S.

10   I'm an observer and I am from CPS Human Resource

11   Services.

12        **DEPUTY DISTRICT ATTORNEY MORRISON:** Lawrence

13   Morrison, M-O-R-R-I-S-O-N, Los Angeles District

14   Attorney and I have all the documents in the checklist.

15   Thank you.

16        **ATTORNEY SPARKS:** Patrick Sparks, S-P-A-R-K-S,

17   attorney for Mr. Ramirez.

18        **INMATE RAMIREZ THROUGH INTERPRETER:** My name is

19   Ramirez. Oh, Martin Ramirez, R-A-M-I-R-E-Z, D-66383.

20        **INTERPRETER UGALDE:** My name is David Ugalde,

21   U-G-A-L-D-E. Marin County interpreter.

22        **PRESIDING COMMISSIONER INGLEE:** Mr. Ramirez, in

23   front of you is an ADA Statement. Would you please read

24   that out loud? I'm going to give a copy to the

25   interpreter unless you want to read it. We would

26   normally ask you to read this, sir. But we do not

27   appear to have one in Spanish so I'm going to, I'm

3

1   going to give this copy to your interpreter and ask him

2   to read it off for you and listen to him closely,

3   please.

4       **INTERPRETER UGALDE:** [Starts to read ADA in

5   Spanish]

6       **PRESIDING COMMISSIONER INGLEE:** You have to speak

7   up a little bit louder, sir.

8       **INTERPRETER UGALDE:** Oh, okay. All right.

9       **ATTORNEY SPARKS:** We want to note that you're

10  actually --

11      **INTERPRETER UGALDE:** Okay. That's good. Okay.

12  [Reads ADA in Spanish]

13      **PRESIDING COMMISSIONER INGLEE:** Did you

14  understand what he read to you?

15      **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

16      **PRESIDING COMMISSIONER INGLEE:** Mr. Ramirez, do

17  you understand English?

18      **INMATE RAMIREZ THROUGH INTERPRETER:** A little

19  bit.

20      **PRESIDING COMMISSIONER INGLEE:** My Spanish is

21  really poco. All right. Officer, could you bring that

22  back over, please? The record reflects that you signed

23  a BPT Form 1073 which is a Reasonable Accommodations

24  Notice and Request in accordance with the provisions of

25  the Americans with Disabilities Act  and that was

26  signed on 12/11/2006. At that time, you said that you

27  had no disabilities. Is that still correct?

4

1          **INMATE RAMIREZ THROUGH INTERPRETER:** It's okay.

2          **PRESIDING COMMISSIONER INGLEE:** You also noted

3     that you would need a Spanish interpreter. Is that

4     correct?

5          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

6          **PRESIDING COMMISSIONER INGLEE:** The gentleman

7     that you're working with today, can you understand him?

8          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

9          **PRESIDING COMMISSIONER INGLEE:** Okay.   We have a

10    few more questions to ask you in this regard. or for a

11    distance of a hundred yards or more?

12         **INMATE RAMIREZ THROUGH INTERPRETER:** No.

13         **PRESIDING COMMISSIONER INGLEE:** Do you need

14    glasses or a magnifying glass in order to read or to

15    see documents?

16         **INMATE RAMIREZ THROUGH INTERPRETER:** This time,

17    yes, I am in need of them.

18         **PRESIDING COMMISSIONER INGLEE:** Does he have

19    glasses with him?

20         **INMATE RAMIREZ THROUGH INTERPRETER:** No, they did

21    not provide it to me yet.

22         **PRESIDING COMMISSIONER INGLEE:** Okay. Well, if

23    you have problems reading then ask your interpreter or

24    your attorney to help you. If it's necessary.

25         **INMATE RAMIREZ THROUGH INTERPRETER:** Thank you.

26         **PRESIDING COMMISSIONER INGLEE:** Do you have any

27    hearing problems?

5

1        **INMATE RAMIREZ THROUGH INTERPRETER:** No.

2        **PRESIDING COMMISSIONER INGLEE:** Have you ever

3    been treated under the triple CMS or EOP mental health

4    program?

5        **INMATE RAMIREZ THROUGH INTERPRETER:** No.

6        **PRESIDING COMMISSIONER INGLEE:** Have you ever

7    taken any psychotropic medication?

8        **INMATE RAMIREZ THROUGH INTERPRETER:** No.

9        **PRESIDING COMMISSIONER INGLEE:** How far did you

10   go in school before you came to prison?

11       **INMATE RAMIREZ THROUGH INTERPRETER:** 6th grade.

12       **PRESIDING COMMISSIONER INGLEE:** 6th grade? Did you

13   have to take any special education classes while you

14   were growing up?

15       **INMATE RAMIREZ THROUGH INTERPRETER:** No.

16       **PRESIDING COMMISSIONER INGLEE:** Do you suffer

17   from any disability that would prevent you from

18   participating in today's hearing?

19       **INMATE RAMIREZ THROUGH INTERPRETER:** No.

20       **PRESIDING COMMISSIONER INGLEE:** Counsel, do you

21   have any comments or concerns regarding your client's

22   ADA rights?

23       **ATTORNEY SPARKS:** No.

24       **PRESIDING COMMISSIONER INGLEE:** This hearing

25   is being conducted pursuant to Penal Code Sections

26   3041, 3042, and the rules and regulations of the Board

27   of Prison Terms governing parole consideration hearings

6

1     for life inmates.  The purpose of today's hearing is to
2     consider your suitability for parole.  In doing so, we
3     will consider the number and nature of the crimes you
4     were committed for, your prior criminal and social
5     history, your behavior and programming since your
6     commitment.  We have had an opportunity to review your
7     central file and your prior hearing transcript.  You
8     will be given an opportunity to correct and clarify the
9     record.  We will consider your progress since your
10    commitment and since your last hearing.  Your updated
11    counselor's report and psychological report will also
12    be considered.  Any change in parole plans should be
13    brought to our attention.  We will reach a decision
14    today, and then we will inform you whether or not we
15    will find you suitable for parole and the reasons for
16    our decision.  If you are found reasonable, suitable
17    for parole, we will tell you the length of your
18    confinement and it will be explained to you.  This
19    hearing will be conducted in two phases.  I will
20    discuss with you the crimes that you were committed
21    for, your prior criminal and social history, your
22    parole plans, and any letters of support or opposition
23    that may be in the file.  Deputy Commissioner Martin
24    will then discuss with you the progress you've made
25    since your commitment, your counselor's report, and
26    your psychological report.  Once that is concluded, the
27    Commissioners, the District Attorney, and your attorney

7

1    will be given an opportunity to ask you questions.  The
2    questions from the District Attorney will be answered
3    through us and the Chair and not back to the District
4    Attorney. Before we recess for deliberations, the
5    District Attorney, your attorney, and you will be given
6    an opportunity to make a final statement regarding your
7    parole suitability.  Your statement should be directed
8    as to why you feel you are suitable for parole.  We
9    will then recess, clear the room and deliberate. Once
10   we've completed our deliberations, we will then resume
11   our hearing and announce our decision. The California
12   Code of Regulations, excuse me, the California Code of
13   Regulations states that regardless of time served a
14   life inmate shall be unsuitable for, found unsuitable
15   for and denied parole if in the judgment of the Panel
16   the inmate would pose an unreasonable risk of danger to
17   society if released from prison.  You have certain
18   rights.  These rights include the right for a timely
19   notice of this hearing, the right to review your
20   central file, and the right to present relevant
21   documents.  Counselor, has your inmate's rights been
22   met in this regard?

23          **ATTORNEY SPARKS:** Yes.

24          **PRESIDING COMMISSIONER INGLEE:**  You also have
25   the right to be heard by an impartial Panel. Do you,
26   does the Inmate have any objections to this Panel?
27          **INMATE RAMIREZ THROUGH INTERPRETER:** No.

8

1    **PRESIDING COMMISSIONER INGLEE:** Counsel, do you

2    have any objection to this Panel?

3           **ATTORNEY SPARKS:** No.

4           **PRESIDING COMMISSIONER INGLEE:**  You will receive

5    a copy of the written copy of our decision.  That

6    decision is subject to review by the Decision Review

7    Unit and by the entire Board meeting as a body.  It

8    will become effective within 120 days.  It is also

9    subject to review by the Governor.  A copy of the

10   tentative decision and a copy of the transcript will be

11   sent to you.  As of May 1st, 2004, there were major

12   changes limiting your former rights of appeal Board

13   decisions or actions directly to the Board.  The old

14   Board regulations were repealed.  The current policy is

15   entitled Administrative Appeals Correspondence and

16   Grievances Concerning the Board of Prison Terms

17   Decisions.  It is available at the prison law library.

18   You are not required to admit your offense or discuss

19   your offense if you do not wish to do so; however, this

20   Panel does accept as true the findings of the Court,

21   and you are invited to discuss the facts and

22   circumstances of the offense if you so desire.   The

23   Board will review and consider any prior statements you

24   have made regarding the offense in determining your

25   suitability for parole.  Deputy Commissioner, is there

26   confidential material in the file and if so, will it be

27   used today?

9

1          **DEPUTY COMMISSIONER MARTIN:** There is some
2    confidential material and it may be used.
3          **PRESIDING COMMISSIONER INGLEE:** As in other
4    hearings, if we decide to use it in the element of the
5    confidential material, we will advise the attorney.
6    Okay. I believe that both the Attorney and Counsel have
7    said that they have all their, their hearing Checklist
8    documents. Is that correct?
9          **ATTORNEY SPARKS:** Yes, I have those. Thank you.
10          **PRESIDING COMMISSIONER INGLEE:** Are any
11    additional documents to be submitted today?
12          **ATTORNEY SPARKS:** No.
13          **PRESIDING COMMISSIONER INGLEE:** Are there any
14    preliminary objections?
15          **ATTORNEY SPARKS:** No.
16          **PRESIDING COMMISSIONER INGLEE:** Will the Inmate
17    be speaking to the Panel?
18          **ATTORNEY SPARKS:** Yes.
19          **PRESIDING COMMISSIONER INGLEE:** On all subjects?
20          **ATTORNEY SPARKS:** Yes.
21          **PRESIDING COMMISSIONER INGLEE:** All right. Please
22    ask him to raise his right hand. Do you solemnly swear
23    or affirm that the testimony you give at this hearing
24    will be the truth, the whole truth, and nothing but the
25    truth?
26          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.
27          **PRESIDING COMMISSIONER INGLEE:** Thank you.

10

1  Counsel, if there's no objections, we will incorporate

2  by reference the statement of facts that come from the

3  Appellate Decision, pages two through four.

4         **ATTORNEY SPARKS:** No objection.

5         **PRESIDING COMMISSIONER INGLEE:** To bring us all

6  up to date so we understand the key elements of the

7  crime, I'm going to read the summary of the crime

8  that's coming off the Board Report that was put out on

9  April 2007. Under the summary of the crime:

10            "On Christmas Eve 1986, the victim,

11            Geraldo Jones was on his way to a

12            Christmas party when someone asked Jones

13            to give him a ride home.  Somebody else

14            drove and the group parked in front of

15            the residence at 1325 East 50th Street,

16            Long Beach.  Geraldo Jones got out of

17            the van apparently to look for a friend.

18            A witness reported that there were four

19            or five Mexican males standing in the

20            driveway when Ramirez shot Jones several

21            times in the abdomen. As Jones fell to

22            the ground, Ramirez then shot him two

23            more times while he was on the ground.

24            There also totaled, there was a total of

25            four gunshot wounds to the abdomen

26            causing Jones' death. A victim of the

27            crime who came upon -- a friend of the

11

| | |
|---|---|
| 1 | victim of the crime who came upon the |
| 2 | scene and tried to administer first aid |
| 3 | told investigating detectives that about |
| 4 | a month before the shooting, there had |
| 5 | been an argument between Jones and |
| 6 | Ramirez with Ramirez threatening to kill |
| 7 | Jones. Several days later, Ramirez went |
| 8 | to Long Beach Police Department and told |
| 9 | the Desk Personnel he was there because |
| 10 | he had killed someone." |

11    Okay, Mr. Ramirez, tell us what happened.

12         **INMATE RAMIREZ THROUGH INTERPRETER:** Do you want
13    me to tell you about the crime? Before, we had had, we
14    argued about some words. He wanted to fight me with a
15    knife. At that time, I left. When I got back home, my
16    father told me that he came to look for me. That one
17    really upset me because I found my family scared at the
18    time. So I went to my other sister's house where he
19    used to live and asked him to come out and I asked him
20    why do you went (sic) to my house to look for me?

21         **PRESIDING COMMISSIONER INGLEE:** Can I ask you a
22    question while he's telling the story? Was his, was the
23    victim going with his sister?

24         **INMATE RAMIREZ THROUGH INTERPRETER:** He used to
25    live in my sister's house.

26         **PRESIDING COMMISSIONER INGLEE:** Yeah, well, did
27    they have any relationship other than the fact that

1    they room there?

2        **INMATE RAMIREZ THROUGH INTERPRETER:** No, he was
3    her brother in law. His sister's brother in law.

4        **PRESIDING COMMISSIONER INGLEE:** So he was married
5    to his sister, I'm confused. Who, tell me who --

6        **INMATE RAMIREZ THROUGH INTERPRETER:** My sister's
7    married with the brother of the victim's wife. Girl.

8        **PRESIDING COMMISSIONER INGLEE:** All right. All
9    right. Go forward.

10       **INMATE RAMIREZ THROUGH INTERPRETER:** I asked him
11   to come out and I asked him why do you come look for
12   me? And he said, 'We have not finished yet what we have
13   started.' That's when I threw him a brick that I had.
14   So when I hit him, he pulled out a knife so when I saw
15   that he pulled out a knife, I started running. And he
16   started chasing me and throwing me the knife but he
17   couldn't reach me. After that time, I continued
18   receiving warnings from him. He was telling me that he
19   was going to kill me. He was going to cut me with the
20   use of a knife. So every time I saw him, I tried to
21   avoid him. I increased my stay but he went to look for
22   me at home. When I saw that he came off from the van, I
23   walked towards my house. When I noticed that he was
24   following me, he pulled out a knife. He was getting
25   closer to me. That's when I shot him. And that's how
26   things went.

27       **PRESIDING COMMISSIONER INGLEE:** Did you try to

13

1    help the man after you shot him?

2              **INMATE RAMIREZ THROUGH INTERPRETER:** No.

3              **PRESIDING COMMISSIONER INGLEE:** Did you run away?

4              **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

5              **PRESIDING COMMISSIONER INGLEE:** Did anyone try to

6    call the authorities to have somebody come and help

7    like 911?

8              **INMATE RAMIREZ THROUGH INTERPRETER:** I did not.

9              **PRESIDING COMMISSIONER INGLEE:** Where did he get

10   the gun?

11             **INMATE RAMIREZ THROUGH INTERPRETER:** Supposedly

12   from, from a friend of mine from L.A.

13             **PRESIDING COMMISSIONER INGLEE:** How long did he

14   have the gun?

15             **INMATE RAMIREZ THROUGH INTERPRETER:** A month,

16   month and a half.

17             **PRESIDING COMMISSIONER INGLEE:** Did he know how

18   to fire the gun?

19             **INMATE RAMIREZ THROUGH INTERPRETER:** I don't know

20   but I bought it.

21             **PRESIDING COMMISSIONER INGLEE:** Did he shoot the

22   gun after he bought it?

23             **INMATE RAMIREZ THROUGH INTERPRETER:** No, I have

24   never shot it.

25             **PRESIDING COMMISSIONER INGLEE:** Not at all?

26             **INMATE RAMIREZ THROUGH INTERPRETER:** No. Nothing.

27             **PRESIDING COMMISSIONER INGLEE:** You bought a gun

14

1    and never found out whether it could shoot or not?

2        **INMATE RAMIREZ THROUGH INTERPRETER:** I had never

3    shot with a gun. That was the first time that I had a

4    gun.

5        **PRESIDING COMMISSIONER INGLEE:** So the victim had

6    a knife?

7        **INMATE RAMIREZ THROUGH INTERPRETER:** He had a

8    gun.

9        **PRESIDING COMMISSIONER INGLEE:** He had a gun or a

10   knife?

11       **INTERPRETER UGALDE:** I mean a knife. I'm sorry. A

12   knife.

13       **PRESIDING COMMISSIONER INGLEE:** How far away was

14   he from you?

15       **INMATE RAMIREZ THROUGH INTERPRETER:** Around five

16   feet or six.

17       **PRESIDING COMMISSIONER INGLEE:** Did you ever

18   consider just leaving?

19       **INMATE RAMIREZ THROUGH INTERPRETER:** Yes, I

20   walked towards my house but he followed me. If I

21   continued walking in the sidewalk, he would have

22   followed me where my family was.

23       **PRESIDING COMMISSIONER INGLEE:** Were there any

24   other people around when he shot the man?

25       **INMATE RAMIREZ THROUGH INTERPRETER:** Yes, there

26   were like three more people.

27       **PRESIDING COMMISSIONER INGLEE:** Where were they?

15

1      **INMATE RAMIREZ THROUGH INTERPRETER:** They were at

2      the entrance of my house, front yard. The yard.

3      **PRESIDING COMMISSIONER INGLEE:** No more

4      questions. Deputy Commissioner?

5      **DEPUTY COMMISSIONER MARTIN:** Thank you.  No

6      questions.

7      **PRESIDING COMMISSIONER INGLEE:** So the man had

8      threatened you? And eventually pulled a knife. Is that

9      correct?

10     **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

11     **PRESIDING COMMISSIONER INGLEE:** And you were

12     carrying a pistol. Why?

13     **INMATE RAMIREZ THROUGH INTERPRETER:** Because he

14     already threatened me many times.

15     **PRESIDING COMMISSIONER INGLEE:** Did he ever point

16     this out to the police authorities?

17     **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.  Once,

18     I turned myself to the police, yes. I had a lawyer at

19     first. Outside.

20     **PRESIDING COMMISSIONER INGLEE:** Well, you're, you

21     know, you're, this man that you killed is somebody that

22     you had known for a while. Is that correct?

23     **INMATE RAMIREZ THROUGH INTERPRETER:** Months. Six

24     or seven months.

25     **PRESIDING COMMISSIONER INGLEE:** Did you know him

26     in Mexico? Did he know him in Mexico?

27     **INMATE RAMIREZ THROUGH INTERPRETER:** No.

16

1      **PRESIDING COMMISSIONER INGLEE:** Okay.  Is there
2      anything else you would like to say about the murder?
3          **INMATE RAMIREZ THROUGH INTERPRETER:** Only that I
4      regret it very much. I know that I  made a big mistake
5      and I have paid, paid very expensive. I damaged a lot
6      of people. I wish I could remedy this situation but I
7      can't.
8          **PRESIDING COMMISSIONER INGLEE:** Did you know any
9      of his family?
10         **INMATE RAMIREZ THROUGH INTERPRETER:** No.
11         **PRESIDING COMMISSIONER INGLEE:** You shot the man
12     once and then he fell to the ground. Is that correct?
13         **INMATE RAMIREZ THROUGH INTERPRETER:** No.
14         **PRESIDING COMMISSIONER INGLEE:** What happened?
15         **INMATE RAMIREZ THROUGH INTERPRETER:** When he was
16     standing up, I shot him with the shots.  And I shot him
17     another, other shot when he was trying to stand up but
18     he was already on the floor.
19         **PRESIDING COMMISSIONER INGLEE:** So you shot him
20     while standing up, the other time while he was down?
21         **INMATE RAMIREZ THROUGH INTERPRETER:** All the
22     shots that I shot were when he was standing up. The
23     shot that I shot him when he was standing up that was
24     the last one.
25         **PRESIDING COMMISSIONER INGLEE:** Well, the report
26     of the killing says that you shot Jones and Jones then
27     fell to the ground. You came on over and shot him again

17

1  on the ground. Is that true?

2  **INMATE RAMIREZ THROUGH INTERPRETER**: No.  I have

3  a document that was presented in Courts that I shot him

4  trying to stand up. I said the same thing in Court. I

5  have the document.

6  **PRESIDING COMMISSIONER INGLEE**: Okay.  Let's move

7  on.  Take a look at your juvenile record. You had no

8  juvenile record. You had no adult convictions or

9  arrests.  Had you ever been arrested in the United

10  States?

11  **INMATE RAMIREZ THROUGH INTERPRETER**: No.

12  **PRESIDING COMMISSIONER INGLEE**: Had you ever been

13  arrested in Mexico?

14  **INMATE RAMIREZ THROUGH INTERPRETER**: No.

15  **PRESIDING COMMISSIONER INGLEE**: Did you come

16  across the border illegally?

17  **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

18  **PRESIDING COMMISSIONER INGLEE**: How many times

19  have you, did you do that?

20  **INMATE RAMIREZ THROUGH INTERPRETER**: Coming

21  illegally here? Only once.

22  **PRESIDING COMMISSIONER INGLEE**: Just once?

23  **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

24  **PRESIDING COMMISSIONER INGLEE**: You never went

25  home and came back?

26  **INMATE RAMIREZ THROUGH INTERPRETER**: I returned

27  once when my mom was in the hospital. It lasted a month

18

 1    and then I came back.

 2          **PRESIDING COMMISSIONER INGLEE:** Okay. Let's take

 3    a look at your personal factors.

 4                "Ramirez was born in Tijuana, Mexico to

 5                Benite Salas, S-A-L-C-E --"

 6          **INMATE RAMIREZ THROUGH INTERPRETER:** Benite

 7    Salce.

 8          **PRESIDING COMMISSIONER INGLEE:** Salce? Okay.

 9                "and Emmanuel Ramirez.  He was brought

10                in Tacome  in Tijuana, Mexico where he

11                completed six years of schooling."

12          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

13          **PRESIDING COMMISSIONER INGLEE:**

14                "Ramirez used marijuana, alcohol and

15                cocaine. He was employed as a truck

16                unloader when arrested. He had resided

17                with his sister in California for four

18                years at the time of the arrest. He had

19                two children who lived with their mother

20                in Los Angeles."

21    This information can be found in the Probation

22    Officer's Report, pages six through eight.  Are you

23    currently in Alcoholics Anonymous?

24          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

25          **PRESIDING COMMISSIONER INGLEE:** And how long had

26    you been there?

27          **INMATE RAMIREZ THROUGH INTERPRETER:** Almost 14,

19

1    15 years.

2            **PRESIDING COMMISSIONER INGLEE:** You never had any

3    breaks?

4            **INMATE RAMIREZ THROUGH INTERPRETER:** No.

5            **PRESIDING COMMISSIONER INGLEE:** Well, the one

6    you're in right now is the organization you'd normally

7    belong to?

8            **INMATE RAMIREZ THROUGH INTERPRETER:** AA.

9            **PRESIDING COMMISSIONER INGLEE:** Here at the

10   prison.

11           **INMATE RAMIREZ THROUGH INTERPRETER:** Yes. And I

12   went once to Narcotics.

13           **PRESIDING COMMISSIONER INGLEE:** Do you know the

14   12 steps of Alcoholics Anonymous.

15           **INMATE RAMIREZ THROUGH INTERPRETER:** Almost all

16   of them.

17           **PRESIDING COMMISSIONER INGLEE:** What is number

18   eight?

19           **INMATE RAMIREZ THROUGH INTERPRETER:** We decide to

20   make a list of all those people we have offended. We

21   decided to repair the damage, the damage cost.

22           **PRESIDING COMMISSIONER INGLEE:** Close. What about

23   number six?

24           **INMATE RAMIREZ THROUGH INTERPRETER:** Eleven I

25   really know but the six, just let me think of it.

26           **PRESIDING COMMISSIONER INGLEE:** Well, the fact

27   that he doesn't know the 12 steps doesn't necessarily

20

1    mean that people are not doing what they're supposed to

2    and understanding the 12 steps. Give us a hearing

3    (inaudible) that the feeling at least that the Inmate

4    has understood the Alcoholics Anonymous program.

5          **INMATE RAMIREZ THROUGH INTERPRETER:** Thank you.

6          **ATTORNEY SPARKS:** He does have as part of his

7    parole plans, the community outreach in Mexico. They've

8    written back to him.

9          **PRESIDING COMMISSIONER INGLEE:** Well, I'm going

10   to give him that he may already know the 12 steps but I

11   want to give him a copy of (inaudible) --

12         **MR. EVANS:** That's in English. I'd recommend --

13         **PRESIDING COMMISSIONER INGLEE:** -- I probably

14   should give that and translate it into Spanish.

15         **INMATE RAMIREZ THROUGH INTERPRETER:** -- I do

16   have it in Spanish. All of it.

17         **PRESIDING COMMISSIONER INGLEE:** Give this to one

18   of your buddies who (inaudible).

19         **INMATE RAMIREZ THROUGH INTERPRETER:** Thank you.

20         **PRESIDING COMMISSIONER INGLEE:** Sure, you know

21   somebody who could use it.

22         **INMATE RAMIREZ THROUGH INTERPRETER:** Thanks.

23         **PRESIDING COMMISSIONER INGLEE:** Okay. Learn your

24   12 steps.

25         **INMATE RAMIREZ THROUGH INTERPRETER:** Yes, I do

26   know them but I'm kind of nervous right now.

27         **PRESIDING COMMISSIONER INGLEE:** I know. I know.

1   But we have men who come in here, we've had two so far
2   this week and they just -- now, to be very frank with
3   you, we've also had one or two that didn't know. So,
4   you know, you are not unique. But it is in your best
5   interest to learn them because it's good to know them
6   and it gives the hearing officers a feeling that you're
7   interested in the program. Okay?
8           **INMATE RAMIREZ THROUGH INTERPRETER:** All right.
9           **PRESIDING COMMISSIONER INGLEE:** Okay.  This
10  doesn't mean that we're not going to give you a
11  hearing, a date if, in fact, we believe that was true,
12  just because you didn't know them but it's one of those
13  things that helps.  Okay. All right.  Let's take a look
14  at your parole plans.  Your parole plans.
15          "Mr. Ramirez plans to live in Tijuana
16          with his father, Andrew Ramirez at
17          Canyon Yuca, Yucatan."
18          **INMATE RAMIREZ THROUGH INTERPRETER:** Yucatan.
19          **PRESIDING COMMISSIONER INGLEE:** Yucatan?  "Number
20  44, Colonia, Mexico.  Tijuana, Baja, California."
21          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.
22          **PRESIDING COMMISSIONER INGLEE:**
23          "Because of his experience as a butcher,
24          he plans to be a butcher. He wants to
25          open his own business in the future with
26          his family. He also has 14 years
27          experience in PIA textiles where he is a

22

1       foreman."

2       All right. And he also has other back up information

3       down here and if the first, if the first plans don't

4       work, he has other issues, other things he can back up

5       to such as your brother for a residence.

6              **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

7              **PRESIDING COMMISSIONER INGLEE:** Next, we'll take

8       a look at your letters.  First, we'll take a look at

9       the 3042 letters that were sent by the prison to the

10      various institutions and Courts that were involved in

11      your incarceration. There were four sent out on

12      2/21/2007. We did receive a letter back. This is from

13      the City of Longbeach. The City of Longbeach sent a

14      letter, March 6, 2007. They first reviewed the crime

15      and then they came and made the following, came down

16      and made the following recommendation:

17             "Due to the callous nature of this

18             murder and the Inmate's attempt to

19             deceive investigators, it is the opinion

20             of the Longbeach Police Department that

21             Inmate Ramirez has not served sufficient

22             time to ensure rehabilitation and should

23             remain incarcerated for the term of his

24             life imprisonment as prescribed by the

25             sentencing court."

26      It went on further to say that:

27             "Inmate Ramirez would be a detriment and

23

1           a liability to society if he were placed

2           free on the streets."

3     This is signed Paul A. Arcala, A-R-C-A-L-A, Sargeant,

4     Homicide Detail.   Okay. We'll look at your letters.

5     Your first letter comes from your daughter and that's

6     Cynthia Ramirez?

7           **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

8           **PRESIDING COMMISSIONER INGLEE**: Yurca?

9           **INMATE RAMIREZ THROUGH INTERPRETER**: (inaudible)

10          **PRESIDING COMMISSIONER INGLEE**: And she is

11    offering you residence in the United States.

12          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

13          **PRESIDING COMMISSIONER INGLEE**: You do know that

14    if you were paroled now or in the future, it's most

15    likely you would be returned to Mexico.

16          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

17          **PRESIDING COMMISSIONER INGLEE**: And so letters

18    for residence in California are not going to work

19    today.   It's a very nice letter but you would be, you

20    would be sent to Mexico.

21          **INMATE RAMIREZ THROUGH INTERPRETER**: Even though

22    I return to Mexico, they are ready to help anyways.

23          **PRESIDING COMMISSIONER INGLEE**: You mean

24    financially?

25          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

26          **PRESIDING COMMISSIONER INGLEE**: Okay.   They do

27    say:

24

1              "In assisting my father with financial

2              support as well as providing him with a

3              place to stay on my own."

4    You might ask her, if you have another hearing, to say

5    how much financial support they could help you with. As

6    an example, $500 a month or a $100 dollars a month.

7    Whatever it might be and so for how many months. Give

8    some example of how they can support you if necessary.

9    Okay?

10             **INMATE RAMIREZ THROUGH INTERPRETER:** That's all

11   right.

12             **PRESIDING COMMISSIONER INGLEE:** And this is a

13   letter from Norma Ramirez. That is your daughter?

14             **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

15             **PRESIDING COMMISSIONER INGLEE:** And that's a

16   letter of support. We have a letter from Javier

17   Ramirez. Is that your brother in Tijuana?

18             **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

19             **PRESIDING COMMISSIONER INGLEE:**

20             "We have arranged for my brother to be

21             provided with housing, transportation,

22             employment and emotional support."

23   Where, where would you stay if you went to Tijuana with

24   your brother?

25             **INMATE RAMIREZ THROUGH INTERPRETER:** I believe in

26   my parents house.

27             **PRESIDING COMMISSIONER INGLEE:** Yeah, because he

25

1   doesn't make it sound like it's his house.

2          **INMATE RAMIREZ THROUGH INTERPRETER:** My house?

3          **PRESIDING COMMISSIONER INGLEE:** No, no. This

4   letter doesn't make it sound like it's his brother's

5   house.

6          **INMATE RAMIREZ THROUGH INTERPRETER:** No, he's got

7   his own house, too.  I do have his address.

8          **PRESIDING COMMISSIONER INGLEE:** Okay, but is he

9   inviting you to live with him or?

10         **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

11         **PRESIDING COMMISSIONER INGLEE:** He is? Okay. We

12  have a letter from your niece, Peaches Lozano Gonzales,

13  Gonzales and that's a letter of support.  And then we

14  have a letter from Isabel Lozano.

15         **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

16         **PRESIDING COMMISSIONER INGLEE:** Is that the same?

17         **INMATE RAMIREZ THROUGH INTERPRETER:** Lozano is

18  the last name as a  married person.

19         **PRESIDING COMMISSIONER INGLEE:** They married the

20  same family.

21         **INMATE RAMIREZ THROUGH INTERPRETER:** One is the

22  mother and one is the daughter.

23         **PRESIDING COMMISSIONER INGLEE:** Oh, okay. And

24  this is from your sister, Isabel?

25         **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

26         **PRESIDING COMMISSIONER INGLEE:** Okay.  And,

27  again, that's a letter of support.

26

1        **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

2        **PRESIDING COMMISSIONER INGLEE:** Well, this is a

3   letter from Charles Walked, Superintendent, Prison

4   Industries in Soledad.

5        **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

6        **PRESIDING COMMISSIONER INGLEE:** And it's a letter

7   of recommendation.

8        **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

9        **PRESIDING COMMISSIONER INGLEE:** And this is being

10  sent to the parole, parole officer, if you are paroled.

11       **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

12       **PRESIDING COMMISSIONER INGLEE:** And he says that

13  you are a very good worker and that you should be given

14  priority treatment that in regard to any available

15  employment that, that's out there. Okay?

16       **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

17       **PRESIDING COMMISSIONER INGLEE:** But it's not a

18  specific job though. It's a recommendation.  Okay. Are

19  there any other letters that you have?

20       **INMATE RAMIREZ THROUGH INTERPRETER:** I have my

21  Supervisor's letter also. My Supervisor chronos.

22       **PRESIDING COMMISSIONER INGLEE:** I don't see it.

23       **ATTORNEY SPARKS:** It's at the PIA.

24       **PRESIDING COMMISSIONER INGLEE:** I thought that

25  one, I thought that this was what --

26       **ATTORNEY SPARKS:** Right. We went over that.

27       **PRESIDING COMMISSIONER INGLEE:** Yeah.

27

1     **ATTORNEY SPARKS:** So we've covered that. And
2     that's in the second. Since it's part of what he's been
3     doing institutionally, we put it in that section.

4     **DEPUTY COMMISSIONER MARTIN:** I, I intended to
5     mention it.

6     **ATTORNEY SPARKS:** Thank you.

7     **PRESIDING COMMISSIONER INGLEE:** I guess you have
8     another letter. I'll go and see this one.  These are,
9     these are jobs in the State of California. He would be,
10    he would be sent to Mexico.

11    **ATTORNEY SPARKS:** And I intend to mention his INS
12    hold that's been enforced at least since 1994.

13    **PRESIDING COMMISSIONER INGLEE:** All right. Let's,
14    let's talk about your parole plans. It appears that you
15    have very strong support with the State of California
16    and you have family members who will possibly support
17    you financially.

18    **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

19    **PRESIDING COMMISSIONER INGLEE:** But we don't
20    know, we don't know how much and for how long. We
21    really should know that. That would be good for you to
22    find out. You have relatives in the State of Baja,
23    Tijuana.

24    **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

25    **PRESIDING COMMISSIONER INGLEE:** And they
26    apparently will provide you with housing,
27    transportation and employment but we don't know what

1    kind of employment it's going to be and where. What
2    your brother needs to do is to send a letter, telling
3    us about the actual job you're going to have, where
4    it's going to be, what's the address and about the
5    business that you're going to be working for and who
6    you're going to be working for. Okay? We need details.
7    **INMATE RAMIREZ THROUGH INTERPRETER:** That's okay.
8    **PRESIDING COMMISSIONER INGLEE:** We recognize that
9    you're going to go to Mexico and that you're not going
10   to be employed in California but we, the State believes
11   that before we send somebody back to Mexico, that we
12   want to be sure that at least, you have a job to go to
13   and that you would not have to return to criminality or
14   go back to the United States if you did not adequate
15   jobs in the way of making a living. Okay? All right.
16   Is there anything on your, on your parole plans you'd
17   like to tell us.
18   **INMATE RAMIREZ THROUGH INTERPRETER:** No,
19   everything's already --
20   **PRESIDING COMMISSIONER INGLEE:** Okay. Very good.
21   Let's go to post conviction factors.
22   **DEPUTY COMMISSIONER MARTIN:** Mr. Ramirez, I'm
23   going to discuss your institutional adjustment and I'm
24   going to emphasize the recent years. I've relied on a
25   review of your C-file and other reports including a
26   recent psychological evaluation made for the 2005
27   calendar.  If it hasn't been already mentioned, you

29

1   were received by CDC in September of '87.  I believe
2   you went to San Quentin and then you arrived at CTF in
3   January of 1989. You were held under Medium A custody
4   and you have a classification score of 19.  This is
5   your fourth subsequent parole consideration hearing and
6   this is as good a time to mention that I'm aware of an
7   INS hold that's been enforced at least since 1994.
8   Regarding your vocation, I believe you have skills as a
9   butcher?

10          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

11          **DEPUTY COMMISSIONER MARTIN:**  But presently, you
12   are employed in the prison industry textiles. You are a
13   foreman and I am aware that you have quite a bit of
14   skilled experience at running various sewing machines.
15   I've seen a chrono from June of 2006 to that effect and
16   I've also seen six training certification chronos that
17   give you grades from satisfactory to above average.
18   Those are dated in 2005 and 2006.  I've also been given
19   information from your attorney today that involve
20   laudatory chrono (sic) from October 2005 for the prison
21   industries fabric enterprise and I have been shown a
22   letter dated July 2006. That was a general laudatory
23   letter to fabric operations and mentioned you
24   specifically as being a contributor to that industry.
25   Despite a lot of skill in textiles and despite a great
26   deal of skill as a sewing, sewing machine operator, you
27   have not yet completed a trade. Am I correct?

30

1   **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

2   **DEPUTY COMMISSIONER MARTIN:** Okay. I thought so.
3   Thank you. Tell me, what is your skill in being a
4   butcher because I believe I heard that you would like
5   to retire with that trade or you would like to own your
6   own butcher shop in Mexico.

7   **INMATE RAMIREZ THROUGH INTERPRETER:** I cut meat.
8   Before we used to do it with a knife but now they have
9   all kinds of machines to do that.  It's a good business
10  to establish and you don't need too much money to
11  start. You could also stay with somebody else.

12  **DEPUTY COMMISSIONER MARTIN:** Where did
13  Mr. Ramirez, where did Mr. Ramirez originally learn
14  that skill?

15  **INMATE RAMIREZ THROUGH INTERPRETER:** In Tijuana.
16  Almost all my family are butchers.  All have worked in
17  the butchers.  Also we have worked the place where they
18  cut it.

19  **DEPUTY COMMISSIONER MARTIN:** Am I correct that
20  Mr. Ramirez would like to own his own shop in Mexico?

21  **INMATE RAMIREZ THROUGH INTERPRETER:** I would like
22  to do so but in the beginning to have to stay with
23  somebody else.

24  **DEPUTY COMMISSIONER MARTIN:** Moving to the
25  subject of self help in the institution, I see that
26  Mr. Ramirez has attended NA, AA. I've seen chronos from
27  July of 2005, January of 2006 and December of 2006 and

1    he is described as having sincerity and commitment to

2    that program. Mr. Ramirez completed the impact program

3    in 2003.  He was affiliated with project change and --

4    **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

5    **DEPUTY COMMISSIONER MARTIN:** -- in September of

6    2006, it was September the 26th 2006, he accomplished a

7    three hour video review of an anger management program

8    as well as a three hour video review of re-engaging

9    into society.

10   **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

11   **DEPUTY COMMISSIONER MARTIN:** Under self help, I

12   often consider education upgrades and I believe that

13   Mr. Ramirez has not completed his GED. Am I correct?

14   **INMATE RAMIREZ THROUGH INTERPRETER:** That's true.

15   I have not finished it.  It's very hard for me to

16   complete the GED.

17   **DEPUTY COMMISSIONER MARTIN:** Because of language

18   issues or because of intellectual issues?

19   **INMATE RAMIREZ THROUGH INTERPRETER:** Language.

20   All I know is that it's a little bit harder for me

21   because the subjects are a little bit higher than what

22   I have studied.

23   **DEPUTY COMMISSIONER MARTIN:** Okay. Okay.  Moving

24   to the topic of discipline in the institution,

25   Mr. Ramirez has only one 115.  That was in 1988 and

26   that involved not being at count.  I think, I read that

27   he was in the wrong cell.

32

1          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

2          **DEPUTY COMMISSIONER MARTIN**: Mr. Ramirez has

3     acquired four 128s, the last one was recent.

4          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

5          **DEPUTY COMMISSIONER MARTIN**: Just six months ago

6     for disobeying an order.

7          **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

8          **DEPUTY COMMISSIONER MARTIN**: What did that

9     involve?

10         **INMATE RAMIREZ THROUGH INTERPRETER**: Because I

11    didn't want to go to an interview of a problem related

12    to a problem that happened in the yard.  I know that I

13    made a mistake but there was a going to break the yard.

14         **DEPUTY COMMISSIONER MARTIN**: I don't understand.

15    He was told not to go to the yard?

16         **INMATE RAMIREZ THROUGH INTERPRETER**: No, I didn't

17    want to go to an interview.

18         **DEPUTY COMMISSIONER MARTIN**: And where was the

19    interview?

20         **INMATE RAMIREZ THROUGH INTERPRETER**: Where they

21    interview you about what happened.

22         **DEPUTY COMMISSIONER MARTIN**: About events in the

23    institution?

24         **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

25         **DEPUTY COMMISSIONER MARTIN**: So Mr. Ramirez felt

26    compulsion from the Inmate Code of Conduct. Am I

27    correct?

33

1       **INMATE RAMIREZ THROUGH INTERPRETER:** Yes, there

2   are rules that you cannot break in there.

3       **DEPUTY COMMISSIONER MARTIN:** I think I understand

4   it. In, we're still talking about 128s and in 2005,

5   Mr. Ramirez received a 128 for having contraband and I

6   understand that was a box cutter.

7       **INMATE RAMIREZ THROUGH INTERPRETER:** It was a

8   blade from a, a razor for shaving and I put a tape

9   around it.

10      **DEPUTY COMMISSIONER MARTIN:** I've seen 115s

11  written for that.

12      **INMATE RAMIREZ THROUGH INTERPRETER:** No.

13      **DEPUTY COMMISSIONER MARTIN:** I'm wrong? I

14  haven't?

15      **INMATE RAMIREZ THROUGH INTERPRETER:** No, I

16  haven't seen that. On my own.

17      **DEPUTY COMMISSIONER MARTIN:** Well, my comment to

18  Mr. Ramirez is that there's been two recent 128s that

19  are a little on the serious side. The two prior to

20  that are for an unexcused absence and a failure to

21  report to a job assignment.

22      **INMATE RAMIREZ THROUGH INTERPRETER:** When was

23  that?

24      **DEPUTY COMMISSIONER MARTIN:** We have four 128s.

25  The two most recent ones in 2005 and in 2006 involve

26  contraband, it was very close to a weapon and

27  disobeying an order.

1    **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

2    **DEPUTY COMMISSIONER MARTIN:** Also what I consider

3    relatively serious. The two older 128s, were for an

4    unexcused absence and a failure to report.

5    **INMATE RAMIREZ THROUGH INTERPRETER:** At work.

6    **DEPUTY COMMISSIONER MARTIN:** (inaudible) in 1987

7    failure to report to a job assignment.

8    **INMATE RAMIREZ THROUGH INTERPRETER:** I don't

9    remember that 128.  Where was I working?

10   **ATTORNEY SPARKS:**  Wasn't it at San Quentin, SQ?

11   **DEPUTY COMMISSIONER MARTIN:** I am looking at a

12   128 chrono dated November 4th 1987. It says that:

13       "On that date at approximately 0600

14       hours, Inmate Ramirez, without proper

15       authorization failed to report to his

16       job assignment in the food service

17       department. This is in direct violation

18       of the Director's Rule. Ramirez is aware

19       of this documentation."

20   Does that answer Mr. Ramirez's question or does that

21   refresh his memory? To answer Counsel, that was from

22   San Quentin.

23   **INMATE RAMIREZ THROUGH INTERPRETER:** I don't

24   remember that they had that handed down.

25   **DEPUTY COMMISSIONER MARTIN:** Okay. I'm going to

26   move on to the 2002 psychological evaluation. I'm going

27   to give my impression that it is largely favorable. It

35

1   says that:

2           "Mr. Ramirez's dangerousness in the

3           institution is well below average

4           compared to level two inmate

5           population."

6   And that same assessment of his dangerousness in the

7   community or rather a similar assessment of his

8   dangerousness in the community is no more than an

9   average citizen. Mr. Ramirez's risk factors are, of

10  course, alcohol and drugs. Mr. Ramirez is referred to

11  as being competent and responsible and the clinician

12  says that there is no mental health disorder that

13  requires treatment.

14          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

15          **DEPUTY COMMISSIONER MARTIN:** I'm finished with my

16  evaluation of institutional adjustment but I'd like to

17  ask Mr. Ramirez a question about his life crime.  May

18  I?

19          **INMATE RAMIREZ THROUGH INTERPRETER:** Yes, sure.

20          **DEPUTY COMMISSIONER MARTIN:** Mr. Ramirez, did you

21  shoot your victim in the back or from behind?

22          **INMATE RAMIREZ THROUGH INTERPRETER:** Not at any

23  time. I did not shoot him from the back. I know that

24  some documents said that he got shot from the back. Not

25  at any moment I shot him in the back.

26          **DEPUTY COMMISSIONER MARTIN:** Well, the

27  pathologist, I believe, felt that one shot was to the

36

1    upper right arm area and fired from behind. Do you

2    disagree with that?

3         **INMATE RAMIREZ THROUGH INTERPRETER**: It's okay

4    what they say. Probably he was falling down when I shot

5    that shot but not at any moment, at any time did I shot

6    (sic) him in the back.

7         **PRESIDING COMMISSIONER INGLEE**: One shot in the

8    back.

9         **INMATE RAMIREZ THROUGH INTERPRETER**: Yes, I knew

10   that there was a shot from the back but I did not shot

11   (sic) him the back.

12        **DEPUTY COMMISSIONER MARTIN**: Okay, I thank

13   everyone for letting me commandeer the hearing for

14   that, that question I had. Mr. Ramirez, have I covered

15   your institutional adjustment?

16        **INMATE RAMIREZ THROUGH INTERPRETER**: Yes.

17        **DEPUTY COMMISSIONER MARTIN**: Counsel, is there

18   anything that I failed to mention?

19        **ATTORNEY SPARKS**: Not that I can see. Thank you.

20        **DEPUTY DISTRICT ATTORNEY MORRISON**: Deputy

21   Commissioner, I believe that we have previously

22   submitted an autopsy report and autopsy photos. There's

23   an indication from our file from the District Attorney

24   at the 1996 hearing and --

25        **DEPUTY COMMISSIONER MARTIN**: Is there? I want to

26   see if those are the ones you're talking about.

27        **DEPUTY DISTRICT ATTORNEY MORRISON**: Well, it says

37

1    autopsy photos and autopsy report on page five. That's

2    gun shot wound number five. The entry of gun shot wound

3    number five is located on the left side of the upper

4    back, about 18 inches from the top of the head and

5    three and a quarter inches left of the midline such,

6    just three inches from the center of the back.

7        **DEPUTY COMMISSIONER MARTIN:** And is that an entry

8    wound, sir?

9        **DEPUTY DISTRICT ATTORNEY MORRISON:** That is an

10   entry wound and it shows a rim of abrasion measuring

11   approximately $1/8^{th}$ of an inch at its thickest part to

12   relatively round wound maybe approximately $3/8^{th}$ of an

13   inch in diameter. There's no powder or tattoo or soot

14   around or within the wound. This wound appears to be a

15   distant gun shot wound. The exit wound is not present.

16   The bullet was recovered on the left side of the

17   thoracic spine near the fourth thoracic spine. This

18   bullet is exactly the same as the others. It's a

19   semi-wad cut type of bullet also appears to be a .38

20   caliber bullet. The direction is basically back to

21   front, slightly left to right and slightly upwards

22   direction. The perforation is noted on the chest wall

23   and back and nicks the spine. It is a potentially fatal

24   gun shot wound.

25       **DEPUTY COMMISSIONER MARTIN:** Thank you,

26   Mr. Morrison.

27       **DEPUTY DISTRICT ATTORNEY MORRISON:** Yes. Happy to

38

1    help.

2         **DEPUTY COMMISSIONER MARTIN**: Then, Counsel, you

3    say that my covering of the institutional has been

4    complete. With that, I'll return to the Chair.

5         **PRESIDING COMMISSIONER INGLEE**: All right. Thank

6    you. I have no questions. District Attorney, do you

7    have any questions?

8         DEPUTY DISTRICT ATTORNEY MORRISON: During this

9    confrontation, did the inmate tell his victim, 'If I

10   see you around here, I'll kill you?'?

11        INMATE RAMIREZ THROUGH INTERPRETER: Did I said

12   (sic)         or he talked?

13        DEPUTY DISTRICT ATTORNEY MORRISON: The Inmate,

14   Mr. Ram       tell that to the victim?

15             RAMIREZ THROUGH INTERPRETER: Never.

16             DISTRICT ATTORNEY MORRISON: Did the

     Inmate    y at his trial?

         THE RAMIREZ THROUGH INTERPRETER: If I said


         DEPUTY DISTRICT ATTORNEY MORRISON: Did the

              us basically the same version to the jury

         as        told the parole Panel today?

         THE RAMIREZ THROUGH INTERPRETER: Yes.

         DEPUTY DISTRICT ATTORNEY MORRISON: Did the

     Inmate       what happened when the victim received

     the fatal gunshot wound when the Inmate shot the

1     **INMATE RAMIREZ THROUGH INTERPRETER:** He continued

2    to advance towards me.

3     **DEPUTY DISTRICT ATTORNEY MORRISON:** Okay. And did

4    he have a knife in his hand at that time?

5     **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.

6     **DEPUTY DISTRICT ATTORNEY MORRISON:** So what

7    happened to the knife?

8     **INMATE RAMIREZ THROUGH INTERPRETER:** I suppose

9    they found the knife in the victim's pocket.

10     **DEPUTY DISTRICT ATTORNEY MORRISON:** Well, if he

11   was shot in the chest the first time and the Inmate hit

12   him three or four times before he fell, then the Inmate

13   continued to shoot the victim after he fell to the

14   ground?

15     **INMATE RAMIREZ THROUGH INTERPRETER:** I shot him

16   one more shot when he wanted to stand up.

17     **DEPUTY DISTRICT ATTORNEY MORRISON:** Okay. So when

18   in the course of events between the first shot that hit

19   him and the last shot that hit him did the victim put

20   the knife in his pocket?

21     **INMATE RAMIREZ THROUGH INTERPRETER:** When he fell

22   down to the floor, he still had that knife in his

23   hands.

24     **DEPUTY DISTRICT ATTORNEY MORRISON:** So why did

25   the police find it folded up in his pocket?

26     **INMATE RAMIREZ THROUGH INTERPRETER:** I didn't

27   (sic) know how they did that.  You'll have to remember

40

1   that other people arrived before the police.

2   **DEPUTY DISTRICT ATTORNEY MORRISON:** So does the

3   Inmate think they folded up the knife, put it in his

4   pocket?

5   **INMATE RAMIREZ THROUGH INTERPRETER:** Yes. That's

6   what I believe.

7   **DEPUTY DISTRICT ATTORNEY MORRISON:** I have no

8   other questions. Thank you.

9   **PRESIDING COMMISSIONER INGLEE:** Okay. Counsel,

10  questions?

11  **ATTORNEY SPARKS:** No, thank you.

12  **PRESIDING COMMISSIONER INGLEE:** Let's go to

13  summary please?

14  **DEPUTY DISTRICT ATTORNEY MOFRISON:** 3042 notices?

15  You read that right?

16  **PRESIDING COMMISSIONER INGLEE:** I've already --

17  **DEPUTY DISTRICT ATTORNEY MORRISON:** The District

18  Attorney joins the Longbeach Police Department, the

19  Inmate's version which was obviously not believed by

20  the jury is summarized in the Appellate, in the

21  Appellate report is contrary to what the other

22  witnesses described and it's summarized in the

23  Longbeach police report in the letter which includes

24  witnesses revealed to investigators that the victim and

25  Inmate Ramirez were involved in an incident about a

26  month prior to the murder in which they chased each

27  other with knives and threw rocks at each other and

41

1  during this, Inmate Ramirez threatened the victim,
2  quote, 'If I see you around here, I'll kill you.' End
3  quote.  The autopsy also shows that the victim had .17
4  blood alcohol level.  And this is inconsistent with the
5  activity described by the Inmate of the victim chasing
6  him and posing a threat.  I have trouble trying to
7  reconcile this. Here's the victim, the Inmate had a
8  grudge against the victim, had previously threatened
9  him and was described by the witnesses as summarized in
10 the official Board Report and in the summary of the
11 other instant trial, it's inconsistent with the
12 Inmate's statement that the Inmate basically saw a guy
13 he previously threatened and that he had a grudge
14 against, pulled out his gun and blew him away.  The
15 Inmate's speculation that other people would come upon
16 a mortally wounded man and take the time to fold up a
17 buck knife which the Inmate had previously described as
18 a switchblade and put it in his pocket, it just seems a
19 little incongruous.  Therefore, it calls into question
20 both the previous psych reports in terms of their
21 assessment, in terms of it's kind of hard to validly
22 assess a person who's not completely truthful. As a
23 psychologist, the veracity is an underscore, underlying
24 requirement for psychological evaluations. Therefore, I
25 do not believe it's totally supportive as though, even
26 though in the 2005 report says he poses no more risk
27 than the average citizen, the average citizen hasn't

1    carried a gun and gunned down a person (inaudible). We
2    oppose parole. Thank you.
3         **PRESIDING COMMISSIONER INGLEE:** All right. Thank
4    you. Counsel, please?
5         **ATTORNEY SPARKS:** Mr. Ramirez has written out a
6    document that I'm going to refer to at this time.  It
7    says that he realizes that he has a US INS hold and he
8    will be deported back to Mexico where he'll reside in
9    his father's house in Tijuana or his brother's house in
10   Tijuana.  We have read letters to that effect. What we
11   missed today was that he got something from Mexico
12   indicating where the meetings would be in the community
13   and maybe, just briefly have Mr. Ugalde confirm if in
14   fact that's what he previously read as the information
15   and then the Panel can just refer to that.
16        **PRESIDING COMMISSIONER INGLEE:** Alcoholics
17   Anonymous meetings?
18        **ATTORNEY SPARKS:** Right.
19        **INMATE RAMIREZ THROUGH INTERPRETER:** Yes.
20        **PRESIDING COMMISSIONER INGLEE:** Okay.
21        **INMATE RAMIREZ THROUGH INTERPRETER:** It has to do
22   with different addresses where --
23        **PRESIDING COMMISSIONER INGLEE:** Good.
24        **INMATE RAMIREZ THROUGH INTERPRETER:** --
25   Alcoholics Anonymous will be meeting at --
26        **PRESIDING COMMISSIONER INGLEE:** Very good.
27        **INMATE RAMIREZ THROUGH INTERPRETER:** -- that he

43

1    could go.

2         **ATTORNEY SPARKS:** So he's looked into that and
3    that's important, part of his parole objective to
4    continue to remain sober and abstain from all alcohol
5    use which is a precursor to violence potentially in the
6    community as noted by the psychological reports. So, he
7    has skills that make him employable in Mexico. The
8    history of being a meat cutter as well as PIA sewing
9    machine and textiles where he provided documentation
10   from the PIA today. He also has provided additional
11   family support letters where he's maintained stable
12   relationships in the community. He writes here that as
13   pursuant to his remorse that he has a great, true and
14   genuine remorse, that he fully accepts responsibility
15   and repercussions of his actions and he believes that
16   his incarceration has been of the type where he has
17   done something positive out of his past mistakes and
18   then he lives his life with his actions not just mere
19   words. As he's now 46 years of age, we have reports
20   from psychological departments which indicate that
21   statistically the probability of recidivism is greatly
22   reduced by greater maturation due to age and he
23   indicates that he would not commit another crime. He
24   has cleared psychological reports. It's my impression
25   that the would pose little to no risk to the community
26   if released at this time. He's completed project
27   change, done Alcoholics Anonymous and those I think

44

1    were the major precursors to his violence. Thank you.

2          **PRESIDING COMMISSIONER INGLEE:** Mr. Ramirez, this

3    is your opportunity to tell us why you believe you are

4    suitable for parole.

5          **INMATE RAMIREZ THROUGH INTERPRETER:** I believe

6    after all these years, I believe that the mentality of

7    a person changes. As you get older, the mentality

8    changes. You don't have the same type of mentality

9    when you were young. You think things better.  I

10   believe that I'm a new person. I don't think the same

11   way that I used to. My feelings are different also.  I

12   believe that if you could give me an opportunity, I

13   could have a life of peace.

14         **PRESIDING COMMISSIONER INGLEE:** Anything else,

15   sir? All right. We're going to recess. And the time is

16   2:38.

17                        R E C E S S

18                          --o0o--

19

20

21

22

23

24

45

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3            **DEPUTY COMMISSIONER MARTIN:** We're back on tape.

4            **PRESIDING COMMISSIONER INGLEE:** All parties that

5    were here when we went into recess have since returned.

6    The time is eight minutes after 3:00. This is in the

7    matter of Martin Ramirez, CDC number D-66383. The Panel

8    reviewed all information received from the public and

9    relied on the following circumstances in concluding that

10   the prisoner is not suitable for parole and would pose

11   an unreasonable risk of danger to society, or a threat

12   to public safety if released from prison.  Mr. Ramirez,

13   you've heard this before and it's something that of

14   course is difficult to have to listen to again but the

15   offense you carried out, we believe was especially cruel

16   and violent and callous in that you shot a victim and in

17   doing so, murdered him. The victim was abused during

18   this offense.  The offense was carried out, we believe,

19   in a dispassionate and calculated manner.  The offense

20   was carried out in a manner which demonstrated an

21   exceptionally callous disregard for human life in that

22   you murdered the victim for an extension of an earlier

23   altercation.  The motive of the crime was inexplicable

24   as the murder, as you already noted, was generated out

25   of a prior feud and argument.  These conclusions were

26   drawn from a statement of facts and as a result of

27   **MARTIN RAMIREZ   D-66383    DECISION PAGE 1    4/25/07**

46

1    an ongoing feud and previous altercation, the prisoner
2    shot the victim causing him to fall to the ground and
3    then proceeded to continue firing additional rounds into
4    the victim as he lay defenseless on the ground until he
5    died.  The prisoner had no escalating pattern of
6    criminal conduct or violence.  However, he did have
7    somewhat of an unstable social history in this regard.
8    He left school in Mexico in the 6th grade. He then
9    illegally entered the United States and while in the
10   United States, he used illegal substances such as
11   marijuana, alcohol and cocaine.  The prisoner has
12   programmed in a limited manner since he's been
13   incarcerated and this is disturbing because he's been in
14   prison for a period of 21 years. In this regard, he has
15   failed to develop a marketable skill that can be put to
16   use upon release even though he does have some
17   experience in the area of being a butcher.  He has
18   failed to upgrade himself educationally or vocationally.
19   He has not received his GED. Now, we accept the fact
20   that he does not speak English and therefore, passing a
21   GED is difficult but we believe he may have more of a
22   command of the English language than he is letting us on
23   to but in a 21 year period of time, he should have
24   gained enough English skills to be, and also educational
25   skills to pass the GED which would give him certainly an
26   advantage upon parole and provide him to be dual,

27   **MARTIN RAMIREZ    D-66383    DECISION PAGE 2    4/25/07**

47

1    bilingual capacity so that when he returns to Mexico, he
2    would have the advantage of being able to speak good
3    English and Spanish.  Unfortunately, he does not have
4    this right at this time.  He has not fully participated
5    in beneficial self help programs. They tend to be off
6    and on and particular with AA. He has however been,
7    been, excuse me, had done an excellent job when it comes
8    to discipline. He has only had four 128s, the last one
9    being, unfortunately, 8/8 of 2006 which of course is
10   less than a year away for disobeying a direct order. He
11   has had only one 115 disciplinary report and that's in
12   regard for being unresponsive to an account, for a
13   count.  And that's 4/2 of 1988 so that's excellent work.
14   His last psychological report dated 3/18 of 2005 and
15   authored by Jeff Howlin, H-O-W-L-I-N, Howlin. Doctor of
16   Education, was favorable. In this regard he said the
17   following: "That his violence potential within a
18   controlled setting is estimated to be well below the
19   average compared to his level two inmate population. If
20   released to the community, his violence potential was
21   estimated to be no more than the average citizen in the
22   community. His most recent, his most significant risk
23   factor would be a precursor to violence would be a
24   return to the abuse of alcohol or drugs. Should this man
25   abuse substances again, his violence potential would be
26   considered much higher than that of the average citizen
27   **MARTIN RAMIREZ    D-66383    DECISION PAGE 3    4/25/07**

48

1    in the community." His parole plans. He does have
2    viable residential plans within the Republic of Mexico
3    and that would be living with his brother in Tijuana.
4    However, he does not have detailed employment plans.
5    There's an indication that he could work for his family
6    but they are, they are only, it's only mentioned having
7    this employment. There is (sic) no details as to what
8    the employment would be, what he'd be doing or how much
9    he'd be paid.  He has not developed a marketable skill
10   that he could take to Mexico other than the experience
11   that he has as a butcher which he did prior to coming to
12   prison.  He does have the start of a plan in regard to
13   his substance abuse by having information on AA in
14   Mexico which we believe is excellent.  His 3042
15   responses. He received a letter, we received a letter
16   from the City of Longbeach in which this is the law
17   enforcement agency that investigated the case and they
18   recommended against parole at this time. The
19   presentation here by the Deputy District Attorney for
20   Los Angeles County and he too recommended against parole
21   at this time.  Because of the recent 128, the prisoner's
22   gains are recent and he must now demonstrate an ability
23   to maintain gains over a more extended period of time
24   also to be able to hopefully be able to expand on his
25   ability to speak English and to deal with his GED and
26   possibly vocation. However, the prisoner should be
27   **MARTIN RAMIREZ   D-66383    DECISION PAGE 4    4/25/07**

49

1   commended for various things he's accomplished while

2   being in prison. I'd like to ask the Deputy Commissioner

3   if he'd go over those for me, please.

4          **DEPUTY COMMISSIONER MARTIN**: Mr. Ramirez, you're

5   to be commended for being a good worker. You get up. You

6   go to work. You get good chronos. You're a good team

7   player and I, I, as an aside, I would like to see you

8   channel that effort into acquiring a vocation or trade

9   but I'm complimenting you on your work ethic. I also

10   want to say at this time that I applaud you for self

11   surrendering after your life crime. I did not mention

12   that earlier but I think that's, that's good that you

13   did that. I'll return to the Chair. Thank you.

14          **PRESIDING COMMISSIONER INGLEE**: The Panel makes

15   the following finding that the Inmate needs additional

16   time in order to be able to pick up on his English

17   skills, hopefully pass the GED, and to be able to

18   complete a vocation. Therefore, in a separate decision,

19   the hearing Panel finds that it is not reasonable to

20   expect that parole would be granted at any time during

21   the next two years. Specific reasons are as follows: He

22   participated in a terrible crime in which he shot a man

23   who he had had an altercation with in the past, a

24   running feud. He shot him while the man was standing.

25   The man fell to the ground. He then shot him two more

26   times while he was on the ground. It was a total of at

27   **MARTIN RAMIREZ   D-66383   DECISION PAGE 5   4/25/07**

1    least four gunshot wounds in the abdomen causing the

2    death of Mr. Jones.  The offense was carried out

3    certainly in a dispassionate and calculated manner. The

4    victim was abused during this offense. Again, because of

5    being shot, falling to the ground and then being shot

6    again.  The offense was carried out in a manner which

7    demonstrated an exceptionally callous disregard for

8    human life. He was shot four to six times in the body.

9    The motive of the crime was inexplicable. As a man who

10   lost his life over a simple feud and altercation.  In a

11   recent psychological examination that was dated 3/18 of

12   2005, makes the following recommendations: "As the

13   Inmate Ramirez has acknowledged history relating to

14   substance use, I would recommend that while in prison,

15   he continue his involvement with AA, also continue with

16   pro-social behavior demonstrated through his

17   incarceration." Finally, the Panel recommends that he

18   remain disciplinary free and we already noted that he

19   upgrade himself by completing one vocation before his

20   next hearing, that he work hard on his basic English

21   skills and work on completing a GED and that, if

22   available, continue to participate in self-help

23   programs.  Good luck, sir.  Do you have any comments

24   you'd like to make?

25        **DEPUTY COMMISSIONER MARTIN:**  Nothing, thank you.

26   Good luck.

27   **MARTIN RAMIREZ    D-66383    DECISION PAGE 6    4/25/07**

51

1          **PRESIDING COMMISSIONER INGLEE:** This hearing is

2      over and the time is 20 minutes after 3:00.

3                  **A D J O U R N M E N T**

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      **PAROLE DENIED TWO YEARS**

24      **THIS DECISION WILL BE FINAL ON:**___AUG 2 3 2007___

25      **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26      **DATE, THE DECISION IS MODIFIED.**

27      **MARTIN RAMIREZ   D-66383   DECISION PAGE 7   4/25/07**

52

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JOAN LIBAN, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 51, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MARTIN RAMIREZ, CDC No. D-66383, on APRIL 25,2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JULY 1, 2007 at Sacramento County, California.

Joan Liban

Joan Liban Transcriber

**Northern California Court Reporters**

# EXHIBIT
# 2

Court of Appeal, Second Appellate District, Div. 4 - No. B204676
**S160766**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re MARTIN A. RAMIREZ on Habeas Corpus

The petition for review is denied.

**SUPREME COURT**
**FILED**

APR − **9** 2008

**Frederick K. Ohlrich Clerk**

_____
Deputy

Chief Justice

$CoPY$

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

COURT OF APPEAL - SECOND DIST

SECOND APPELLATE DISTRICT

**FILED**

JAN 3 1 2008

DIVISION FOUR

JOSEPH A. LANE _____ Clerk

S. VEVERKA _____

Deputy Clerk

B204676

In re MARTIN A. RAMIREZ,

on Habeas Corpus.

(Los Angeles County
Super. Ct. No. A035761)
(Steven R. Van Sicklen, Judge)

ORDER

THE COURT:*

The petition for writ of habeas corpus filed on December 31, 2007, had been read and considered and is denied. Petitioner has failed to state sufficient facts or legal authority demonstrating entitlement to the relief requested. There is "some evidence" to support the findings of the Board of Parole Hearings. (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)

_____          _____          _____
*EPSTEIN, P.J.                   WILLHITE, J.                      MANELLA, J.

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA  90012 | FILED<br>...OURT<br>LOS<br>DEC 03 2007<br>·K.<br>J.. DEPUTY |
| PLAINTIFF/PETITIONER:<br><br>LAWRENCE WEISWASSER | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004700 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☐ Order re: Request for Extension of Time
- ☒ Order Petition for Writ of Habeas Corpus
- ☐ Order re: Writ of Habeas Corpus
- ☐ Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

12-03-07
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Miriam Gonzalez_ Clerk


Martin A. Ramirez
D-66383
P.O. Box 705
CTF North Facility
Soledad, CA 93960-0705


Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Mr. Gregory J. Marcot

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | MIRIAM GONZALEZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH 004872 | |
| In re, | |
| MARTIN A. RAMIREZ | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on August 31, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that the Petitioner presents an unreasonable risk of danger to society and is unsuitable for parole. Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on September 16, 1987 after a conviction for second degree murder. The term was fifteen years to life in prison. His minimum parole eligibility date was December 27, 1996.

The record reflects that on December 24, 1986, the Petitioner shot and killed Geraldo Jones. There was a total of four gunshot wounds to the abdomen. A witness reported that the Petitioner had shot the victim again after he had fallen to the ground. The Petitioner indicated that the victim had threatened to kill him with a knife on several occasions and had come to his family's home looking for him. The Petitioner was in fear for his life and the safety of his family, and believed that he would be killed. He also indicated that the victim had pulled a knife on him at the time of the fatal shooting.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on April 25, 2007. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he is released. The Board based its decision on the commitment offense and the Petitioner's institutional behavior.

1

| Minutes Entered |
|---|
| 10-26-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

Date: OCTOBER 26, 2007

| Honorable: | STEVEN R. VAN SICKLEN | Judge | MIRIAM GONZALEZ | Deputy Clerk |
|---|---|---|---|---|
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004872

In re,

MARTIN A. RAMIREZ

Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

The Court finds that there is some evidence to support the Board's finding that the commitment offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). The record reflects that the Petitioner had shot the victim after he had already been shot and fallen to the ground. However, the record does not support the Board's finding that the motive for the crime was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The Petitioner indicated that he was threatened several times by the victim and that the Petitioner was in fear for his life.

The Board noted that the Petitioner had no prior convictions of any kind. However, it found that the Petitioner did have four 128s and one 115. It cited the recent date of two of the 128s as a basis for its decision. However, there is no record of any violent 115s in the Petitioner's many years in prison, and his institutional behavior is not a basis upon which parole could properly be denied.

The Board also relied upon the fact that the Petitioner had not received his GED, while acknowledging that his lack of English skills would make that difficult to accomplish. It noted that he had not fully participated in beneficial self help programs, but there was no evidence to support that finding. The Board also found that the psychological report found him to be very favorable for release.

The Board's decision may be upheld, despite flaws in its findings, if it is clear it would have reached the same decision even absent the errors. See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100. The fact that the offense demonstrated an exceptionally callous disregard for human suffering constitutes a sufficient basis for the Board's decision.

2

Minutes Entered
10-26-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**DEPT 100**

| Date: | OCTOBER 26, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | MIRIAM GONZALEZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004872
In re,
MARTIN A. RAMIREZ
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

In addition, it noted that the Long Beach Police Department and Los Angeles County District Attorney's Office had opposed the Petitioner's release. While this is also not a factor on which the Board may rely to deny parole, such opposition may be properly considered. Penal Code § 3402.

The Board also noted several positive gains that the Petitioner has achieved while incarcerated. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing. Penal Code § 3041(b).

Finally, the Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The reasons were specified in the Board's decision, and essentially repeated the rationale for denying parole. The reasons need not be completely different from those justifying the denial of parole, and a sufficient basis for the two year denial did appear in the record as a whole. See *In re Jackson* (1985) 39 Cal.3d 464, 479.

As indicated in *Rosenkrantz, supra, 29* Cal..4th 616, 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating suitability for parole, as long as there is some evidence to support the finding of unsuitability. See also, *In re Jacobson*, (Second Appellate District Court of Appeal, August 28, 2007), (2007) -- Cal. App. 4th – , and *In re Hyde* (Second Appellate District Court of Appeal, August 7, 2007) (2007) – Cal. App. 4th --.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

3

Minutes Entered
10-26-07
County Clerk

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: OCTOBER 26, 2007 | | |
|---|---|---|
| Honorable: STEVEN R. VAN SICKLEN | Judge \| MIRIAM GONZALEZ | Deputy Clerk |
| NONE | Bailiff \| NONE | Reporter |

(Parties and Counsel checked if present)

BH 004872

In re,

MARTIN A. RAMIREZ

Counsel for Petitioner:

Petitioner,

On Habeas Corpus

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Martin A. Ramirez
D-66383
P.O. Box 705
CTF North Facility
Soledad, CA 93960-0705

Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Mr. Gregory J. Marcot

Minutes Entered
10-26-07
County Clerk

Legal Mail

Martin A. Ramirez D-66383
P.O. Box 689/FW-138-U
CTF Central Facility
Soledad, CA.93960-0689

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA.94102



02 1M
0004229613
MAILED FROM Z

UNITED STATES POSTAGE